697 A.2d 511

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. ANTHONY MAURICE NORMAN, A/K/A QUADER,
A/K/A TONY FAIR, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT AND CROSS–
RESPONDENT, v. EDWARD LAMONT DUNCAN, A/K/A LA-
TEEF, DEFENDANT–RESPONDENT AND CROSS–APPEL-
LANT.

Argued January 21, 1997—Decided July 8, 1997.

6

*Kevin G. Byrnes*, Designated Counsel, argued the cause for appellant, Anthony Maurice Norman (*Susan L. Resiner*, Public Defender, attorney).

*Raymond W. Hoffman*, Assistant Prosecutor, argued the cause for appellant and cross-respondent, State of New Jersey, in State v. Duncan and for the respondent, State of New Jersey, in State v. Norman (*Clifford J. Minor*, Essex County Prosecutor, attorney).

*John M. Apicella* argued the cause for respondent and cross-appellant, Edward Lamont Duncan.

*J. Michael Blake*, Assistant Deputy Public Defender, argued the cause for amicus curiae, Office of the Public Defender, in State v. Duncan (*Susan L. Reisner*, Public Defender, attorney).

*Edward L. Duncan* submitted supplemental briefs pro se.

The opinion of the Court was delivered by

HANDLER, J.

This appeal arises from the separate dispositions of individual applications for post-conviction relief brought by two defendants who participated together in a drug-related homicide, for which each, in a separate trial, was convicted of murder.

The central issue in these two cases is the constitutional right to the assistance of counsel and the extent to which that right requires representation by counsel who is conflict-free. Each defendant alleges that the relationship between their attorneys created a prejudicial conflict of interest that necessitates reversal of their murder convictions. The two attorneys involved in representing defendants shared office space, eventually became partners, and were paid their fees by one of the defendants. In addition, one defendant's attorney appeared at the other defendant's arraignment, and representation of one defendant on appeal continued after the actual formation of the partnership.

The Appellate Division, in separate decisions, was seemingly split on the resolution of those issues, granting post-conviction relief to one of the defendants, but not to the other. The Court now must determine whether the ties between the attorneys created conflicts of interest that warrant the application of a per se rule that imputes prejudice to the defendants as a matter of law

and requires the reversal of the convictions, or, if not, whether such ties amounted to potential conflicts of interest that require an evaluation of the likelihood of prejudice that could require reversal of the convictions.

I

On February 18, 1989, Norris Holmes was shot dead near his home in Newark. The shooting resulted from what appears to have been a dispute between several drug dealers and their friends over turf and money. Holmes, however, was not the target of the shooting; instead, he was the unfortunate victim of defendants' dispute with Robert Henderson.

Holmes spent the early morning hours with Henderson, Clarence Moody, and his brother Caldwell Moody, in Newark, drinking beer, smoking marijuana, and sniffing cocaine. Before daybreak, the four of them were approached by Anthony Norman, one of the defendants in this case. Norman, who was a drug dealer in the area, instructed Henderson to get off the block, apparently because Norman believed that Henderson was selling drugs in his territory and possibly because Norman was angry about having been robbed previously by Henderson. Henderson and Holmes drove away, and Caldwell and Clarence went to their apartment at 71 Farley Avenue.

Norman, Douglas Sherman, and Edward Duncan, the other defendant in this case,[1] were already at the Moodys' apartment when Caldwell and Clarence arrived. Duncan, who was angry at Caldwell because Caldwell owed him money related to their drug dealing, assaulted Caldwell. While that argument was ongoing, Henderson and Holmes arrived outside the building and honked their car horn. Duncan, after identifying Henderson, instructed Caldwell to go downstairs and send Henderson up. Duncan

---

[1] The Appellate Division believed that Norman and Duncan were cousins, but the record contradicts that assertion. Specifically, Norman testified that he was not in any way related to Duncan.

apparently intended to ambush Henderson. As a part of that ambush, Duncan instructed Sherman to hand out guns; Sherman gave an Uzi to Norman and a Mach 10 to Duncan.

Henderson, with Holmes trailing, went upstairs, but when Henderson spotted Duncan holding a gun, the two fled. Norman and Duncan pursued. After crashing through the glass-plated front door and running across the porch and down to the street, shots were fired, and Holmes was hit. After he was struck and while lying on the ground, Holmes asked, "why did you shoot me?" Holmes was pronounced dead at a hospital later that morning. At trial, a forensic pathologist would testify that Holmes had died from a single gunshot wound to the abdomen that had caused internal hemorrhaging and blood loss. After the shooting, Norman and Duncan ran back upstairs, put the guns in Sherman's black bag, and fled to East Orange.

Duncan was eventually arrested and made a statement. In the statement, which was introduced at his trial but not at Norman's trial, Duncan admitted that he had been at the apartment with a gun, but he stated that it was Norman who had chased and shot Holmes. Duncan claimed that he had grabbed his Mach 10 and followed Holmes, Henderson, and Norman outside, but that Holmes had been shot by the time he made it to the street.

Upon his arrest, Norman also made a statement. Norman said that when Holmes and Henderson came upstairs, he was hiding behind the apartment door with a gun while Duncan was standing in front of the door with a gun. Norman admitted that he and Duncan had given chase when Holmes and Henderson had run, and he admitted that he had been closer to Holmes and Henderson. Norman claimed, however, that both Duncan and he had fired their guns.

Norman, Duncan, Sherman, and Caldwell were indicted for the purposeful-or-knowing murder of Holmes, in violation of *N.J.S.A.* 2C:11–3a(1) and/or (2); unlawful possession of firearms, in violation of *N.J.S.A.* 2C:39–5b; possession of firearms for an unlawful

purpose, in violation of *N.J.S.A.* 2C:39–4a; and aggravated assault of Henderson, in violation of *N.J.S.A.* 2C:12–1b.

Upon confinement in county jail, Duncan or Duncan's family contacted an attorney, Richard Roberts, who previously had represented Duncan in a separate criminal matter. Roberts's unwritten fee arrangement with Duncan provided that his fee would be paid out of the $25,000 bail that Duncan's family had posted. Accordingly, Roberts obtained a bail assignment from Duncan's family.

When Roberts was first contacted, Duncan told him that his codefendant, Norman, also needed an attorney. Roberts apparently recommended Michael Pedicini, a friend of his from the 1970s when they were assistant prosecutors together, and Roberts discussed with Pedicini whether he would be interested in the case. At the time, Roberts and Pedicini shared office space but were not partners nor even associated; they each had separate secretaries, phones, trust accounts, and expense accounts. Norman did in fact come to be represented by Pedicini, with Roberts and Pedicini reaching an agreement between themselves to split equally Duncan's $25,000 bail money.

On June 7, 1989, it was Roberts, though, and not Pedicini who appeared at Norman's arraignment. Roberts stated at the arraignment that Pedicini was representing Norman, but that Pedicini was trying a case in federal court and could not attend the arraignment. Roberts also stated that Norman had received a copy of the indictment and waived its reading. The court then entered pleas of not guilty.

The trial court severed the cases for trial, with Norman's case proceeding first. At issue in both cases was the identity of the shooter—Norman or Duncan—and the admissibility and reliability of the confessions.

On February 13, 1990, the day prior to Norman's trial, the trial court heard and evaluated testimony and arguments by the parties concerning Norman's confession to the police. The court conclud-

ed that Norman had been read his *Miranda* [2] rights, understood those rights, and voluntarily, knowingly, and intelligently waived them. The court disbelieved Norman's contention that he had been under duress and that he had been drinking and ingesting drugs to such an extent that he could not understand or voluntarily waive his rights. The court also denied Norman's motion to admit Caldwell Moody's statement to the police; in the statement, Caldwell stated that Duncan had been the person who shot Holmes and that although Norman had fired his gun, he "didn't hit anyone [because] he can't handle the gun that well." The court reasoned that because Caldwell was a codefendant and, therefore, could not be questioned about the statement, its admission would constitute unreliable hearsay and would be cumulative to other expected testimony.

Norman's trial proceeded from February 14 to February 16, 1990. Dr. Pierre–Louis testified that he had performed the autopsy on Holmes and that the autopsy had revealed that Holmes died from a single gunshot wound to the abdomen. He stated that the bullet's trajectory as indicated by the wounds was consistent with the bullet having been fired by someone who had been above the victim, such as on some stairs or on a landing. He further stated that because of the absence of powder burns, the shooter must have been standing at least eighteen inches away.

Henderson, the intended victim of the shooting, testified that Holmes had been shot as Holmes and he ran down the stairs and out of the apartment building. Henderson did not know who had fired the shots because he had not looked back, but he testified that numerous shots had been fired, including one that had grazed his hand, and that several people had pursued them out of the apartment building. He identified Duncan as the person who had been in the apartment and threatened him with a gun when he had gone upstairs. Henderson also stated that, when he had given a statement to the police and had examined a photo array,

---

[2] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

he had identified Duncan as the person who fired at Holmes and him. Henderson's only testimony implicating Norman concerned the episode earlier in the evening when Norman had instructed him to get off the street.

Detective Eutsey testified regarding Norman's confession. In the confession, Norman stated that he had been upset with Henderson because Henderson had robbed him a couple of months earlier. When Norman had spotted Henderson at 71 Farley Avenue, Duncan had instructed Caldwell to bring him upstairs. While Caldwell was getting Henderson, Norman said he had hidden behind the door in the apartment with a gun while Duncan, also armed, had stood in front of the door. Norman further stated that when Henderson had come upstairs with Holmes and spotted Duncan with the gun, Holmes and Henderson had fled. Norman admitted in his confession that he had chased them and that both Duncan and he had fired guns at them.

Clarence Moody, Caldwell's brother, testified at Norman's trial as well. Clarence confirmed that he had spent the night walking around and ingesting drugs with Henderson, Holmes, and Caldwell. He also identified Norman as the person who had accosted Henderson earlier in the evening and had instructed Henderson to get off the block. After that confrontation, Clarence recounted how he and Caldwell had gone to their apartment at 71 Farley Avenue and had met with Duncan, Norman, and Sherman. He also confirmed that Duncan had assaulted Caldwell at the apartment because Caldwell had owed him some drug money. Henderson then drove up, and Duncan told Caldwell to bring him upstairs. Clarence reiterated that Duncan and Norman then had armed themselves with guns from Sherman and had awaited Henderson. Clarence recalled that when Henderson and Holmes had gone upstairs and then had fled upon spotting Duncan with a gun, Norman and Sherman had given pursuit. He did not remember who had gone downstairs first. Moreover, he did not witness the shooting, although he heard shots being fired and saw Holmes limping on the street when he looked out the window. On cross

examination, Clarence admitted that he had told the police that he did not recall Norman having a gun that morning, but he claimed that he had been confused by the police questioning. His clear recollection at trial was that Norman had possessed a gun that evening.

After the State rested, the defense put on no case other than to call Norman's mother to testify about her recollections of Norman's arrest. The defense sought to establish that the arrest was forceful and coercive and that Norman's subsequent confession should thus be discredited or discounted.

The State's theory, as expressed during summation, was that Norman was guilty of purposeful-or-knowing murder as either principal or accomplice. Thus, even if Norman did not fire the shot that hit and killed Holmes, the State argued, he was guilty as an accomplice because Norman and Duncan had "acted together in furtherance of one goal, and that was to kill and rob Henderson." The trial court instructed the jury on accomplice liability. Its instructions were repeated to the jury after it asked for a clarification of the accomplice and murder charges.

Half an hour after the clarifying instructions, Norman was found guilty of the purposeful-or-knowing murder of Holmes as well as other related counts, including gun possession and the aggravated assault of Henderson. The jury was not asked to specify, nor did it, whether it had found Norman guilty as a principal or an accomplice. On March 19, 1990, the trial court sentenced Norman to the minimum allowable sentence of thirty years incarceration without the possibility of parole and concurrent terms of four years on the nonmerged gun count and seven years on the aggravated-assault count.

One month later, from April 23 to April 26, 1990, Duncan was tried and convicted. The trial court held a *Miranda* hearing to weigh the admissibility of Duncan's statement to the police. As with Norman's statement, the court found Duncan's confession to have been made voluntarily and knowingly and thus admitted it into evidence. Subsequently, during jury selection, when Roberts

introduced himself to the jury, he announced that he was "from the firm of Roberts, Pedicini and Fielo."

Duncan's trial proceeded much like Norman's trial had. Clarence again testified that Caldwell had been sent downstairs by Duncan to retrieve Henderson while Duncan and Norman had armed themselves. Clarence again recounted how Norman had hidden behind the door, while Duncan had stood in front of it with gun in hand. When Henderson and Holmes arrived upstairs, they spotted Duncan with a gun and ran. Duncan and Norman gave pursuit and shots were fired. Clarence saw that Holmes had been hit, although he did not see who had fired the fatal shot. Clarence then recalled seeing Duncan and Norman run back upstairs. Clarence stated that he then had said to Duncan and Norman that "You all shot somebody," to which Duncan had replied "I know." Duncan and Norman then fled.

Detective Eutsey also testified at Duncan's trial, this time detailing Duncan's confession. In the confession, Duncan claimed that Norman, not he, had shot Holmes. Duncan admitted that he had instructed Caldwell to go bring Henderson upstairs, but he claimed in his confession that, when Henderson and Holmes had arrived upstairs, it was Norman who had burst from behind the door with an Uzi, and it was only then that he had grabbed a gun. Duncan admitted having run down the stairs after Henderson and Holmes, but he claimed that by the time he arrived outside, Norman already had shot Holmes.

Another witness making a repeat appearance was Dr. Pierre–Louis. He again opined that the cause of Holmes's death was a bullet that had passed through his body at a downward sloping trajectory.

Unlike in Norman's trial, Henderson did not testify. Instead, the State called Essex County Investigator Frank Racioppi. He testified that he had served a subpoena on Henderson and then recounted his efforts to locate Henderson when Henderson had not appeared.

The State then rested. The defense, after obtaining the dismissal of the aggravated-assault charge for lack of evidence that Henderson had been harmed, rested without putting on any witnesses.

Once again during summation the State emphasized that Duncan did not have to have fired the lethal bullet in order to be guilty: "Now if you decide that you can't make a definite conclusion that this defendant fired the fatal shot, he is still guilty as an accomplice." The State pointed out that the evidence showed that Duncan had sent Caldwell down to get Henderson, that Duncan then had armed himself, and that Duncan had chased Henderson and Holmes down the stairs with a gun in his hand. Thus, even if the jury simply believed Duncan's self-serving confession, the State argued, it still could "conclude beyond a reasonable doubt that this defendant [was] an accomplice by his own admission."

Following summations, the trial court instructed the jury on purposeful-or-knowing murder and on accomplice liability. Duncan's jury, like Norman's jury, asked for further clarification of the interplay between the murder count, the aggravated manslaughter count, and accomplice liability. The court reread those instructions from its original charge. Later that day, the jury returned a verdict finding Duncan guilty of purposeful-or-knowing murder, unlawful possession of a handgun, and possession of a handgun for an unlawful purpose. The jury did not specify whether it had found Duncan guilty of murder as a principal or an accomplice.

On May 15, 1990, the trial court sentenced Duncan. Like Norman, Duncan received a sentence of thirty years without parole for the murder of Holmes. The gun counts were merged together and defendant was given a concurrent sentence of four years on that count.

The Appellate Division heard Duncan and Norman's direct appeals separately. On July 12, 1991, in an unpublished opinion, the court rejected Duncan's claims that his confession should have been excluded and that the trial court should have granted a

mistrial after it was forced to remove a deliberating juror. On that same day, the court rejected Norman's numerous claims, including those related to the admission of his confession and the exclusion of Caldwell's statement to the police. We denied certification in both Norman's, 127 *N.J.* 549, 606 *A.*2d 363 (1991), and Duncan's cases, 130 *N.J.* 397, 614 *A.*2d 619 (1992).

On June 5, 1992, Norman filed a petition for post-conviction relief ("PCR"), alleging, for the first time, a conflict of interest between his attorney and Duncan's attorney and error in the accomplice-liability instructions. On May 11, 1993, Duncan filed his PCR petition, raising the same two claims as Norman as well as several additional claims, mostly related to ineffective assistance of counsel.

The trial court held separate hearings exploring the conflict claims. During those hearings, the court took testimony from the prosecutor, Roberts, Pedicini, Norman, Norman's mother, Norman's brother (Alvin), and Duncan.

The first of the hearings, held on May 13, 1993, in Norman's case, established that Roberts had asked Pedicini to represent Norman. Pedicini agreed and agreed to split with Roberts the bail money that Duncan's family had posted. At the time, Pedicini and Roberts shared office space, but had separate secretaries, phone lines, and bank accounts. Pedicini asserted that he and Roberts had not signed a lease and formally started their partnership until May 1990. Pedicini testified that both Norman and his mother were aware that his fee was coming from Duncan's bail money. Norman and his mother later confirmed that those conversations had occurred; Norman testified that he was aware of the bail arrangement but that he thought Pedicini and Roberts were partners at the time. Pedicini denied that the fee arrangement had affected his representation at all. Pedicini further testified that he had approached the prosecutor to try to negotiate a plea for Norman, but that "[t]he Prosecutor's Office was not interested in it at all."

Following that hearing, the trial court found that Norman had been aware that Duncan had arranged to pay for his attorney. Although the court determined that Pedicini had been "unwise" to consent to such a fee arrangement, it concluded that, absent a showing of actual affiliation between Roberts and Pedicini or a showing of improper conduct that had infected Norman's representation or trial, the convictions should not be set aside. Finding that Pedicini and Roberts had not been partners at the time of Norman's trial and finding that Pedicini's representation of Norman had been "well within the bounds of proper assistance," the court denied Norman's conflict claim. The court also rejected the balance of Norman's claims.

On January 25 and January 26, 1995, the trial court conducted hearings on Duncan's claim of conflict. Roberts testified that when Duncan had hired him, he was in solo practice but was sharing office space with several attorneys including Pedicini. Each attorney had his or her own secretary, separate trust and payroll accounts, and separate phones. Roberts recalled that he and Pedicini had formed a partnership on May 1, 1990, several days after the conclusion of Duncan's trial. He was certain that the partnership had commenced sometime after the conclusion of Duncan's trial. Roberts claimed that Pedicini's representation of Norman had not affected or altered his defense of Duncan, and that both he and Pedicini had discussed with their respective clients the contemplated partnership. Roberts recounted that, after he had recommended that Pedicini represent Norman, Pedicini and he had agreed to split equally the $25,000 bail that Duncan's family had posted. Roberts confirmed that he had continued to represent Duncan on his direct appeal even after Pedicini and he had become partners.

Roberts also testified at the hearing that he had contemplated calling Alvin, Norman's brother, as a witness, but that he ultimately had decided not to do so. Roberts recalled that Alvin claimed that Norman had confessed to Alvin that he had shot Holmes. Roberts stated that he had ended up not calling Alvin because he

had believed that Alvin's testimony was inadmissible hearsay and because Alvin also would have given testimony that Norman had told him that Duncan was armed that day. Such testimony, Roberts opined, "would have been devastating to [Duncan's] case." Roberts, however, later conceded that he had told the jury during summation that Duncan had possessed a gun that day and that he had even conceded to the jury that it should convict Duncan of the gun counts.

Alvin testified at the hearing that he had in fact been told by Norman that Norman, not Duncan, had shot Holmes. Alvin confirmed that he also had learned that Duncan had had a gun that evening and had been hiding in the apartment behind the door. Alvin admitted that he had no personal knowledge of the events of the evening, but simply had heard details of the shooting from Norman and Duncan.

Duncan testified that he had asked Roberts to find an attorney to represent Norman. Duncan asserted that he had never given Roberts permission to use part of his bail money to pay Pedicini and that he had no knowledge that Roberts and Pedicini were partners until July 1991. Duncan then claimed that he had not had any intent to kill Holmes or Henderson on the night in question.

Following the testimony, the trial court denied Duncan's petition for PCR. The court credited Roberts's testimony and found that Pedicini and Roberts had not become partners until after Duncan's trial. Thus, the court concluded, no per se conflict existed. The court did "recognize that at trial during opening statements Mr. Roberts named himself as an attorney from the firm of Roberts, Pedicini and Fielo"; however, the court found that even if they were partners, there was "no evidence that this affiliation ... created an actual conflict of interest or that it adversely affected Mr. Roberts's performance." The court concluded that "because of the lack of actual affiliation between the attorneys, Roberts and Pedicini, the severance of the trials, the lack of showing any improper loyalty toward[ ] the co-defendant

Norman, ... the contention of conflict of interest cannot stand." The trial court also rejected the balance of Duncan's arguments, including Duncan's claim that Alvin should have been called as a witness, which the court found to have been a strategic decision.

On December 12, 1995, in an unpublished per curiam opinion, a panel of the Appellate Division affirmed the trial court's dismissal of Norman's PCR petition. The court found that the trial court's "findings with respect to the representation by the attorneys and their separate practices [were] amply supported by the record." Specifically, the appellate court affirmed the trial court's findings that Roberts and Pedicini, although sharing office space, had not been associated at the time of the trial and had maintained separate files, offices, secretaries, phone lines, and bank accounts.

On January 31, 1996, in an unpublished per curiam opinion, a different Appellate Division panel set aside Duncan's conviction, finding that Roberts and Pedicini had been partners or held themselves out as partners at the time of Duncan's trial. Because there had not been full disclosure to defendants on the record about their association, the court concluded that the conflict was reversible error. Further, the court found that Roberts's reasons for failing to call Alvin as a witness were "not supportable." Specifically, the court concluded that Alvin's testimony would not have been damaging to Duncan's case and would have fallen within an exception to the hearsay rule. Although the court noted that strategic reasons for not calling Alvin may have existed, it found that in such circumstances all doubts had to be resolved in favor of giving Duncan a new trial.

We granted the State's petition for certification regarding the Appellate Division's reversal, on conflict grounds, of the trial court's denial of Duncan's petition for post-conviction relief, 145 *N.J.* 372, 678 *A.*2d 713 (1996), Duncan's cross-petition for certification relating to the accomplice-liability and transferred-intent jury instructions, 145 *N.J.* 372, 678 *A.*2d 713 (1996), and Norman's petition for certification regarding the Appellate Division's affirmance of the denial of his petition for post-conviction relief, 145

*N.J.* 372, 678 *A.*2d 713 (1996). We subsequently permitted the Public Defender to brief and argue the case as *amicus curiae.*

## II

The United States and New Jersey Constitutions provide that a criminal defendant has the right to the assistance of counsel. *U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 10. The right to counsel encompasses the right to effective counsel. *Glasser v. United States,* 315 *U.S.* 60, 70, 62 *S.Ct.* 457, 465, 86 *L.Ed.* 680, 699 (1942); *State v. Land,* 73 *N.J.* 24, 372 *A.*2d 297 (1977). Effective counsel must provide the client with undivided loyalty and representation that is "untrammeled and unimpaired" by conflicting interests. *State v. Bellucci,* 81 *N.J.* 531, 538, 410 *A.*2d 666 (1980) (quoting *Glasser, supra,* 315 *U.S.* at 70, 62 *S.Ct.* at 465, 86 *L.Ed.* at 699, and citing *Land, supra,* 73 *N.J.* at 31, 36, 372 *A.*2d 297, and other cases).

We have had occasion to interpret the constitutional guarantees of assistance of counsel in the context of joint representation of criminal defendants. In *Bellucci, supra,* we were faced with a case in which an attorney who had represented the defendant in his prosecution for gambling offenses previously had represented two codefendants in the same case prior to their pleading guilty; in addition, the attorney's law partner had represented yet another codefendant in the same action and continued to represent him at a joint trial. We found impermissible conflicts in respect of both the attorney's prior representations and the attorney's partner's continued representation. 81 *N.J.* 531, 410 *A.*2d 666.

Regarding the prior representation, we found clear evidence that the attorney's obligations to preserve the confidences and secrets of his prior clients had had the strong potential to affect his representation. Specifically, we noted that the codefendants and Bellucci had starkly conflicting interests—Bellucci had claimed that the codefendants could corroborate his innocence, while the codefendants had had an interest in remaining off the witness stand to avoid their "resulting exposure to cross-examina-

tion, [which] might have brought inculpatory evidence to the attention of their sentencing judge." *Id.* at 540, 410 *A.*2d 666. We recognized that the attorney had "placed himself in the same 'impossible [position] of receiving and respecting confidential communications which may assist one defendant and harm another,' created by multiple representation at trial." *Ibid.* (citing *Land, supra,* 73 *N.J.* at 30, 372 *A.*2d 297). We viewed that conflict of interest as being substantial, creating a great likelihood of prejudice to the defendant, and thus rendering the attorney's representation of Bellucci constitutionally defective. *Id.* at 539–41, 410 *A.*2d 666.

We also found a conflict in the attorney's representation of Bellucci at the same trial in which his law partner had represented a codefendant. Finding it appropriate to impute each partner's professional knowledge to the entire firm, regardless of actual disclosure, we held that such joint representation by private law partners created a per se conflict such that actual prejudice need not be shown. *Id.* at 541–43, 410 *A.*2d 666. Thus, whether the joint representation had occurred through a single attorney or by associated attorneys, "once a potential conflict exists, prejudice will be *presumed* in the absence of waiver." *Id.* at 543, 410 *A.*2d 666. That per se rule was needed, we determined, because "[t]he harm in dual representation is caused by the restraints placed on an attorney's advocacy and independent judgement.... [and because] [t]he harmful effects of a conflict ... will not ordinarily be identifiable on the record." *Ibid.* Moreover, "[t]he shared economic interest of the entire firm.... is itself a source of conflict." *Id.* at 541, 410 *A.*2d 666. Finally, we ruled, waiver of the constitutional right to effective counsel was not to be presumed, and "[i]n no event is waiver to be found from a silent record." *Id.* at 544, 410 *A.*2d 666.

▮▮▮ *Bellucci* thus created a two-tier system for evaluating conflict-of-interest claims, an approach to which we have continued to adhere. If a private attorney, or any lawyer associated with that attorney, is involved in simultaneous dual representations of

codefendants, a per se conflict arises, and prejudice will be presumed, absent a valid waiver. *Cf. Land, supra,* 73 *N.J.* at 36, 372 *A.*2d 297 (finding joint representation by a private attorney of husband and wife in a criminal matter to have "apparent" potential for conflict and finding prejudice to be "obvious"). Otherwise, the potential or actual conflict of interest must be evaluated and, if significant, a great likelihood of prejudice must be shown in that particular case to establish constitutionally defective representation of counsel. *See State v. Bell,* 90 *N.J.* 163, 171, 447 *A.*2d 525 (1982) (refusing to apply *Bellucci's* per se rule to public defenders, but holding that if "the circumstances demonstrate a potential conflict of interest and a significant likelihood of prejudice, the presumption of both an actual conflict of interest and actual prejudice will arise").

Those rulings provide for broader protection against conflicts under the State Constitution than are provided by the Federal Constitution. *See State v. Sanchez,* 129 *N.J.* 261, 274–75, 609 *A.*2d 400 (1992); *Bell, supra,* 90 *N.J.* at 171 & n. 4, 447 *A.*2d 525; *Bellucci, supra,* 81 *N.J.* at 545–46, 410 *A.*2d 666; *see also Cuyler v. Sullivan,* 446 *U.S.* 335, 348, 100 *S.Ct.* 1708, 1718, 64 *L.Ed.*2d 333, 346–47 (1980) ("In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."). It is under our more protective state standard that we analyze defendants' claims.

### III

We first must determine whether the attorneys in this case, Roberts and Pedicini, were partners or otherwise similarly associated. If they were, a per se conflict existed, and prejudice is presumed, and, hence, defendants' convictions must be set aside. If they were not, then we must decide whether to expand the per se conflict rule to attorneys who are contemplating partnership arrangements. If we neither find that a partnership existed nor conclude that the per se rule should be expanded, we then must

examine whether a potential or actual conflict existed based on the attorneys' relationship and whether that conflict generated a significant likelihood of prejudice.

### A.

■ There is scant evidence that a partnership existed prior to or during Norman's and Duncan's trials. Both Roberts and Pedicini stated under oath that the partnership had come into existence only after the conclusion of the two trials. Roberts testified that the partnership had begun on May 1, 1990, and he expressed no reservations in his recollection that the partnership had commenced after the conclusion of Duncan's trial. Pedicini's testimony was in every respect consistent with that assertion. He testified that Roberts and he had not signed a lease and formally started their partnership until May 1990. Rather, they both testified that prior to their formal partnership, they had shared office space, but otherwise kept their affairs separate. They had separate phones, secretaries, files, and bank accounts. At oral argument, we learned that additional documentation supports their contention that the partnership did not begin until May 1.

The only evidence casting any doubt on Roberts's and Pedicini's testimony is the fact that Roberts introduced himself during Duncan's trial, which was held in late April 1990, as "an attorney from the firm of Roberts, Pedicini and Fielo." The trial court, however, explicitly recognized the conflicting evidence, weighed that evidence, and concluded that Roberts and Pedicini had not become partners until May 1, 1990, after Norman's and Duncan's trials had concluded.

The trial court's evaluation of the competing evidence and its conclusion that Roberts and Pedicini were correct in their recollection is supported by substantial credible evidence and thus is entitled to deference. *See Bonnco Petrol, Inc. v. Epstein,* 115 *N.J.* 599, 607, 560 *A.*2d 655 (1989). The Appellate Division concluded that Roberts's recollection "was faulty and that he and Pedicini were partners or held themselves out as partners by the

time [Duncan's] trial began." The Appellate Division, in effect, erroneously substituted its opinion for that of the trial court where the trial court's opinion was based on a detailed evaluation of the credibility of the witnesses before it and was amply supported by the evidence. *See Rova Farms Resort v. Investors Ins. Co.,* 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974); *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964).

Defendants point to Roberts's representation of Norman at his arraignment as evidence of joint representation. During that brief arraignment, Roberts clearly stated that Pedicini represented Norman but that Roberts was merely filling in for him because he was trying a case in federal court and could not attend. That situation is markedly different from that in *State v. Sanders,* 260 *N.J.Super.* 491, 616 *A.*2d 1345 (1992), where the Appellate Division held that an attorney's representation of a defendant during a pretrial bail hearing was a bar to his future representation of a codefendant. Bail hearings, as recognized by the court in *Sanders,* entail the exchange of substantial amounts of confidential information. In fact, during bail hearings, attorneys are obligated to argue the circumstances of the offense, the apparent likelihood of conviction, the accused's criminal record, his reputation and mental condition, his ties to the community, and any other circumstances that would bear upon his risk of flight. *Id.* at 496–97, 616 *A.*2d 1345; *see State v. Johnson,* 61 *N.J.* 351, 364–65, 294 *A.*2d 245 (1972) (defining circumstances under which bail should be granted). In contrast, arraignments are usually pro forma appearances where no confidential information is revealed or discussed. In fact, Norman's arraignment did not last more than a minute or two and entailed no discussion about the case aside from an acknowledgment that Norman had received a copy of the indictment and discovery, that he waived the reading of the indictment, and that he entered a plea of not guilty. Further, Roberts clearly stated his status as a temporary fill-in for a colleague who could not attend the appearance. Thus, we need not even decide whether an attorney who actually represents a client at an arraignment is barred from later representing a codefendant. What

occurred here was simply not the type of representation that gives rise to a per se conflict. Roberts did not "appear against a former client in the same litigation in which he ha[d] previously provided representation." *Reardon v. Marlayne, Inc.*, 83 *N.J.* 460, 470, 416 *A.*2d 852 (1980).

■■■■ Defendants also point to Roberts's representation of Duncan on appeal after the formation of the Roberts–Pedicini partnership as giving rise to the protections of *Bellucci*'s per se rule. Defendants note that in *Land, supra*, we held that "[t]he constitutional right to the 'assistance of counsel' contemplates that the attorney's position as an advocate for his client should not be compromised before, during or after trial." 73 *N.J.* at 29, 372 *A.*2d 297. We reaffirm that holding and reemphasize that *Bellucci*'s per se rule applies to joint representation that occurs before, during, or after trial. However, there simply was no joint representation here, even after the formation of the partnership and Roberts's representation of Duncan on appeal. Rather, this case is one of successive representation. At the time Pedicini joined in partnership with Roberts, he no longer represented Norman, so *Bellucci*'s per se rule does not apply.[3]

---

[3] By finding no per se rule mandating reversal of the convictions, we do not mean to endorse the practices that occurred in this case. In fact, it appears that the disciplinary rules bar exactly that type of representation:

> When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by RPC 1.6 and RPC 1.9(a)(2) that is material to the matter.

[*R.P.C.* 1.10(b).]

*See also R.P.C.* 1.10(d) ("When lawyers terminate an association in a firm, none of them, nor any other lawyer with whom any of them subsequently become associated, shall knowingly represent a client when doing so involves a material risk of violating RPC 1.6 or RPC 1.9."); *Dewey v. R.J. Reynolds Tobacco Co.*, 109 *N.J.* 201, 536 *A.*2d 243 (1988) (discussing interplay of disciplinary conflict rules).

*Bellucci, supra,* expressed a common-sense rule that close association, where there is ready access to confidential information among the attorneys and where the attorneys have conflicting financial stakes in the outcome of a case, creates a per se bar to joint representation. 81 *N.J.* at 541, 410 *A.*2d 666. Those same concerns are not present here. *See State v. Grice,* 109 *N.J.* 379, 385, 537 *A.*2d 683 (1988) (finding no conflict as a result of an office-sharing arrangement); *Bell, supra,* 90 *N.J.* 163, 447 *A.*2d 525 (concluding that no presumption of prejudice arises simply by fact of multiple representation in same criminal action by different attorneys in a public defender's office); *see also Petition for Review of Opinion 552,* 102 *N.J.* 194, 507 *A.*2d 233 (1986) (rejecting per se rule as applied to government entities and their officials and employees).

### B.

Defendants urge us to expand *Bellucci* to cover attorneys who contemplate the formation of a partnership but who have not consummated the partnership at the time the alleged conflict arises. We decline to do so.

In *Bell,* we refused to expand *Bellucci*'s per se conflict rule, even to an analogous situation. We recognized the danger of absolute rules that are inflexible in recognizing the subtleties of the facts of specific cases, and we acknowledged that automatic reversals of well-supported criminal convictions without inquiry into the fairness and justness of the verdict should be the exception and not the rule. The Court in *Bell, supra,* recognized the desirability of a flexible rule that would not compromise the constitutional right to effective and unconflicted representation. 90 *N.J.* at 169–71, 447 *A.*2d 525.

Expanding *Bellucci*'s per se rule to every case where attorneys have discussed the possibility of associating, whether or not they end up as associates, would create an unworkable morass. The existence of a per se conflict simply cannot depend on decisions and events that transpire or do not transpire after the allegedly

deficient representation. Such a rule necessarily would upset many convictions without any antecedent benefit to the right of defendants to have conflict-free representation. We have no knowledge of the frequency with which criminal defense attorneys discuss associating, but anecdotal evidence suggests that it may be quite a common occurrence.

The per se rule of *Bellucci* is preferable for identifying those few well-defined cases in which prejudice is presumed, while the more flexible approach of *Bell* is better attuned to the shades of cooperation inherent in any discussions of future association. Thus, while the principles set out in *Bellucci* remain applicable to private associated attorneys, we hold that partnership negotiations, even ones that eventually prove fruitful, do not give rise to a per se conflict.

## C.

Despite the absence of a per se conflict, defendants still may be able to establish constitutionally deficient representation. If the circumstances demonstrate a potential or actual conflict of interest as well as a great likelihood of prejudice, defendants' claim will be established. *Id.* at 171, 447 *A.*2d 525. To establish prejudice, Duncan relies principally on the failure to call Alvin as a witness, while Norman stresses the unorthodox fee arrangement whereby Duncan, in essence, paid for Norman's attorney.

## 1.

In determining whether, in Duncan's trial, the failure to call Alvin gave rise to a great likelihood of prejudice arising from a conflict of interest, we must consider whether Alvin's proposed testimony was admissible and relevant to the defense and whether it realistically could have affected the verdict.

The trial court, echoing Roberts, believed that Alvin's testimony would have been inadmissible hearsay and unhelpful to the defense. The Appellate Division, in Duncan's case, disagreed, concluding that "[a]n out of court statement by a co-defendant that

incriminates himself while exculpating the defendant on trial is admissible in the defendant's case as an exception to the hearsay rule." The court further found that "if the jury believed Alvin that Norman and not [Duncan] was the shooter, it is possible that they may have viewed defendant's participation differently." Both conclusions warrant exploration.

Out-of-court statements that are against the penal interest of the declarant are admissible if the statements were against the declarant's interest at the time made. *N.J.R.E.* 803(c)(25); *State v. Abrams,* 140 *N.J.Super.* 232, 235, 356 *A.*2d 26 (App.Div.1976), *aff'd o.b.,* 72 *N.J.* 342, 370 *A.*2d 852 (1977); *State v. Gaines,* 147 *N.J.Super.* 84, 97–98, 370 *A.*2d 856 (App.Div.1975), *aff'd o.b. sub nom. State v. Powers,* 72 *N.J.* 346, 370 *A.*2d 854 (1977). Not all statements against interest, however, are admissible. The statements must be so far against the declarant's interests "that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true." *N.J.R.E.* 803(c)(25). Moreover, the statements must have been against the declarant's interest when made. *Ibid.* Statements by a declarant that exculpate another, "inferentially indicate[ ] his own involvement," *State v. Davis,* 50 *N.J.* 16, 28–29, 231 *A.*2d 793 (1967), *cert. denied,* 389 *U.S.* 1054, 88 *S.Ct.* 805, 19 *L.Ed.*2d 852 (1968), and are considered sufficiently against the declarant's penal interests to be admissible. Thus, Norman's statement to Alvin, presumably made prior to Norman's trial, that he, not Duncan, had shot Holmes was admissible at Duncan's trial.

Admissibility of Alvin's testimony, however, is only part of the issue; Duncan also must establish that Alvin's testimony, if admitted, would have had the potential to impact the deliberations and verdict in his trial. In attempting to determine whether Alvin's testimony would have affected the verdict, we must remember that Duncan was tried as both a principal and an accomplice. A defendant is guilty as an accomplice when "[w]ith the purpose of promoting or facilitating the commission of the offense; he ... [a]ids or agrees or attempts to aid such other

person in planning or committing it." *N.J.S.A.* 2C:2–6c. "[F]or accomplice liability to attach the defendant must have a purpose that someone else engage in the conduct which constitutes the particular crime charged." John M. Cannel, *New Jersey Criminal Code Annotated,* Comment 7 on *N.J.S.A.* 2C:2–6 (1996–97). Thus, if the defendant possesses "whatever culpability is required for the substantive crime," *ibid.,* and "the defendant ... actually foresee[s] and intend[s] the result of his or her acts," *State v. Bridges,* 133 *N.J.* 447, 456, 628 *A.*2d 270 (1993), then he is guilty as an accomplice. The provisions of the murder statute under which Duncan was charged require that the killing be purposefully or knowingly undertaken. *N.J.S.A.* 2C:11–3a(1) & (2). Therefore, to be guilty as an accomplice to murder, the defendant must intend for the principal to engage in the killing, and the defendant must act with purpose or knowledge in promoting or facilitating the killing.

 Alvin's testimony would not have affected the overwhelming evidence that even if Duncan did not in fact shoot Holmes, he was at least an accomplice to the murder. Alvin's testimony would have solidified further the State's case that Duncan ordered Caldwell to bring Henderson, armed himself in anticipation of Henderson's arrival, and, when Henderson and Holmes got upstairs, brandished his gun and pursued them. In fact, Alvin's testimony would not even have contradicted the evidence that Duncan fired his gun at Henderson and Holmes. Rather, Alvin's testimony simply would have suggested that it was Norman and not Duncan who actually hit Holmes. Whose shot felled Holmes, however, was not dispositive of the murder charge if Duncan, as all of the credible evidence indicated, shared the murderous intent. *Cf. State v. Nunez,* 209 *N.J.Super.* 127, 131, 506 *A.*2d 1295 (App.Div.1986) (finding that evidence that the defendant was at the scene, had participated in the beating of the victim, had received a knife from his codefendant, and had chased the victim, was "sufficient to raise an inference of murderous intent. ...

[thus] warranting the accomplice instruction," even though the codefendant was the person who stabbed the victim to death).

Moreover, if Alvin had testified about what Norman had told him, the State would have been permitted to introduce other statements made by Norman about the shooting. The evidence rules specifically provide that,

> When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if the declarant had testified as a witness. Evidence of a statement or other conduct by a declarant, inconsistent with the declarant's hearsay statement received in evidence, is admissible although declarant had no opportunity to deny or explain it.

> [*N.J.R.E* 806.]

Thus, in *State v. Sego*, 266 *N.J.Super.* 406, 629 *A.*2d 1362, *certif. denied*, 134 *N.J.* 566, 636 *A.*2d 523 (1993), the Appellate Division permitted a codefendant's confession to the police that implicated the defendant after the defense had been allowed to elicit, pursuant to the against-penal-interest exception, a statement by the codefendant exculpating the defendant. Pursuant to that reasoning, had Alvin testified about Norman's statement exculpating Duncan, the State would have been permitted to introduce Norman's confession. Norman's confession confirmed the State's theory of the case that Duncan had ordered Caldwell to bring Henderson upstairs so that Duncan could ambush him. Further, Norman stated during the confession that Duncan had been armed and that Duncan and he had chased Holmes and Henderson down the stairs. Most significantly, Norman explicitly stated in the confession that both he and Duncan had fired their guns at Holmes and Henderson. Thus, Alvin's testimony would have opened the door to damning confirmatory evidence of Duncan's guilt of first-degree murder.

Because Alvin's testimony had little or no capacity to affect the verdict in Duncan's case, we determine that even if Pedicini's representation of Norman created the possibility of affecting Roberts's decision to call Alvin, Duncan has failed to establish a substantial likelihood of prejudice from that alleged conflict. We

are satisfied therefore, that Duncan's petition for post-conviction relief should not be granted.

### 2.

Norman points to the unusual fee arrangement, whereby Pedicini received his payment from Duncan's bail money, as having created a significant conflict that created a substantial likelihood of prejudicing him. There can be no question that that fee arrangement created a potential conflict. *See In re Abrams,* 56 *N.J.* 271, 275, 266 *A*.2d 275 (1970) (recognizing that payment of attorney fees by third party who could be implicated by the defendant's testimony, "has the inherent risk of dividing an attorney's loyalty"); *see also Wood v. Georgia,* 450 *U.S.* 261, 268–69 & n. 15, 101 *S.Ct.* 1097, 1102 & n. 15, 67 *L.Ed.*2d 220, 228–29 & n. 15 (1981) (citing *Abrams,* and noting that "[c]ourts and commentators have recognized the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise"). We must determine whether that potential conflict had a substantial likelihood of prejudicing Norman.

Norman points to the plea negotiations as the sole aspect of the fee arrangement that created a great likelihood of prejudice arising from the conflict. According to Norman, the conflict arose because,

> Duncan was paying Pedicini to conduct negotiations in which Duncan had a substantial interest that directly conflicted with the interests of Pedicini's client, Norman. If the negotiations were successful, the case against Duncan would have been strengthened by the accomplice witness testimony of Norman, and Norman would have received the benefit of a reduced charge or sentence. If the negotiations were unsuccessful (which they were), the case against Duncan would not be as strong as it could have been with Norman's testimony, and Norman would not receive the benefit of any reduction of charges or sentence.

The State responds that Norman was fully aware that Duncan was paying for his attorney and did not object to the arrangement, and it argues that Pedicini would have had no reason to alter his tactics to please Duncan because the money Pedicini was to receive, although paid by Duncan, was being held by Roberts.

Further, the State notes that Pedicini did not in fact alter his strategy, as indicated by his willingness to engage in plea negotiations and his subsequent trial defense of accusing Duncan of being the shooter.

 The State's arguments are unpersuasive. The fact that Duncan and Norman had knowledge of and acquiesced in Pedicini and Roberts's association and fee arrangement is not, under our law, sufficient to constitute a waiver. There is a presumption against waiver, and waiver will be found only when it is on the record and when the trial court has assured itself that the defendant waiving the conflict is aware of the potential hazards of joint representation. *Bellucci, supra,* 81 *N.J.* at 544–45, 410 *A.*2d 666. The fact that Roberts, rather than Duncan himself, held the payment is also immaterial. Roberts was Duncan's attorney, and the monies for both fees originated with Duncan.

In *Abrams, supra,* we noted the "inherent risk of dividing an attorney's loyalty between the defendant and the [person] who will pay for the services." 56 *N.J.* at 275, 266 *A.*2d 275. In *Bellucci, supra,* we recognized the importance and pervasive practice of plea bargaining and held that "[t]o effectively advise his client as to what pleas should be entered, defense counsel must be free to explore all possibilities, including pretrial negotiations." 81 *N.J.* at 540, 410 *A.*2d 666. We cannot recreate the plea negotiations to determine whether an actual conflict occurred. Our precedent, however, does not require that. Rather, it is the significant likelihood of an actual conflict and resultant prejudice that determines our conclusion.

 Here, we know that Duncan and Norman were drug dealers in business together. We know that one of the two shot and killed Holmes. We also know that Norman had substantial knowledge of the shooting and presumably about Duncan's drug dealings, so that the State would have been interested in his cooperation. We know that plea negotiations actually occurred, but that they, for some unspecified reason, collapsed. Further, we have yet to be apprised of any credible explanation as to why

Duncan would agree to pay for Norman's defense, but we can surmise that Duncan may have been concerned about Norman's potential cooperation. In such circumstances, where the defendants have starkly conflicting interests, we would be remiss if we did not recognize a significant conflict and strong likelihood of prejudice. *See, e.g., Pirillo v. Takiff,* 462 *Pa.* 511, 341 *A.*2d 896, 904 (1975) ("This fee arrangement clearly has a chilling effect upon a . . . witness who is considering cooperation, since his access to . . . paid counsel depends directly on his agreement not to cooperate."), *cert. denied,* 423 *U.S.* 1083, 96 *S.Ct.* 873, 47 *L.Ed.*2d 94 (1976).

█ That analysis requires that Norman's petition for post-conviction relief be granted, although it does not constitute a separate basis for granting Duncan's petition for post-conviction relief. The standard for evaluating such claims, unlike *Bellucci*'s narrow, per se conflict exception, continues to require a showing of a significant actual or potential conflict that created a substantial likelihood of prejudice. Under that standard, Duncan's claim must be rejected because the fee arrangement neither implicated *Bellucci*'s per se protections nor posed a substantial likelihood of having prejudiced him. In fact, the fee arrangement may have redounded to his benefit.

## IV

Aside from the conflict claims, defendants also assert that certain jury instructions were fatally flawed. Because this claim was raised neither at trial nor on direct appeal, defendants must bring it under the ineffective-assistance-of-counsel standard. *See R.* 3:22–4 (barring claims from post-conviction review that could have been raised on direct appeal).[4] Specifically, defendants maintain that their respective counsels performed below a level of

---

[4] There is, of course, an exception to this rule when enforcement of the bar would result in a fundamental injustice. *R.* 3:22–4. We discuss the application of that exception later.

reasonable competence in not objecting to the defective jury charge and that but for their professional errors, there is a reasonable probability that the results of the proceedings would have been different.[5] *See Strickland v. Washington*, 466 *U.S.* 668, 694, 104 *S.Ct.* 2052, 2068, 80 *L.Ed.*2d 674, 698 (1984); *State v. Fritz*, 105 *N.J.* 42, 60–61, 519 *A.*2d 336 (1987).

■ The trial court stated during its instructions that "[a] person is an accomplice of another person in the commission of an offense if with the purpose of promoting or facilitating the commission of the offense he solicits such other person to commit it or he aids or agrees or attempts to aid such other person in planning or committing it." There is no question that the jury charge delivered by the trial court was deficient. In *State v. Bielkiewicz*, 267 *N.J.Super.* 520, 632 *A.*2d 277 (1993), the Appellate Division ruled that jury instructions on accomplice liability must include an instruction that a defendant can be found guilty as an accomplice of a lesser included offense even though the principal is found guilty of the more serious offense. Not only did the jury charges delivered here not include that instruction, but the trial court even instructed the jurors, as a part of the accomplice-liability instructions, that defendant "must have shared the same intent, the same purpose required to be proved of the person who actually committed the crime." Thus, the issue is whether defendants' attorneys were deficient in not objecting to the erroneous charge and whether those deficiencies posed a reasonable probability of having affected the outcome of the trials.

■ "Judicial scrutiny of counsel's performance must be highly deferential," and must avoid viewing the performance under the "distorting effects of hindsight." *Strickland, supra,* 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694; *see State v. Buonadonna*, 122 *N.J.* 22, 42, 583 *A.*2d 747 (1991). Thus, we recently recognized that "[b]ecause of the inherent difficulty in

---

[5] Defendants similarly critique their appellate counsels for failing to raise that claim on direct appeal.

evaluating defense counsel's performance solely on the basis of the circumstances existing at the time of trial, the *Strickland* Court admonished courts to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *State v. Marshall,* 148 *N.J.* 89, 157, 690 *A.*2d 1 (1997) (*Marshall III* ) (quoting *Strickland, supra,* 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694). Therefore, "[e]ven if counsel made strategy miscalculations or trial mistakes, 'if our adversary system is to function at all effectively, these may not be permitted to impair the binding nature of the proceedings, except in those rare instances where they are of such magnitude as to thwart the fundamental guarantee of fair trial.'" *Buonadonna, supra,* 122 *N.J.* at 42, 583 *A.*2d 747 (quoting *State v. Dennis,* 43 *N.J.* 418, 428, 204 *A.*2d 868 (1964)).

Counsels' failings here do not rise to that level. We find neither a fundamental injustice that demands a relaxation of the procedural bar to this claim nor sufficient prejudice to defendants to meet the second prong of the ineffective-assistance standard. The evidence is overwhelming that defendants shared a murderous intent; there is no basis in the evidence to infer any difference in defendants' mental states. They armed themselves with high-powered guns and set up an ambush. When the ambush was uncovered and the intended victim fled, they pursued with guns in hand. Either Duncan, Norman, or both of them fired numerous shots at the target, just slightly injuring him but killing his friend. Both defendants then took flight. There is simply no reasonable view of the evidence that would permit one to conclude that defendants fired the shots or aided in the firing of the shots with anything less than homicide in mind.

Finally, viewing the erroneous charge in the context of the overall charge, and not in isolation, reinforces our conclusion that no harm befell defendants as a result of the error. *See State v. Reyes,* 140 *N.J.* 344, 658 *A.*2d 1218 (1995) (finding any error in diminished-capacity instruction to be harmless based on the full context of the charge); *see also Cupp v. Naughten,* 414 *U.S.* 141,

146–47, 94 *S.Ct.* 396, 400, 38 *L.Ed.*2d 368, 372 (1973) ("[It is a] well established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.") (citing *Boyd v. United States,* 271 *U.S.* 104, 107, 46 *S.Ct.* 442, 443, 70 *L.Ed.* 857, 859 (1926)). The accomplice instructions delivered here applied not only to the murder charge but also to the lesser included offenses of aggravated manslaughter and reckless manslaughter, both of which the court exhaustively detailed for the jury. Thus, the jury was well aware of the alternative offenses and was even aware that the accomplice instructions applied to them. The only possible confusion would be if the jury had concluded that the defendant on trial possessed a less culpable mental state than his codefendant. Yet, the jurors were not charged with the task of determining the codefendant's guilt, so it is, at best, a remote possibility that they were distracted from their task by a conclusion that the principal had possessed a more culpable intent than the accomplice.

V

The Appellate Division's judgment granting Duncan's petition for post-conviction relief is reversed, and the matter is remanded to that court for consideration of the remainder of his claims. The Appellate Division's judgment affirming the denial of Norman's petition for post-conviction relief is reversed, and the matter is remanded to the Law Division for further proceedings not inconsistent with this opinion.

STEIN, J., concurring in part and dissenting in part.

I join in the Court's determination that "the significant likelihood of an actual conflict [between defense counsel] and resultant prejudice," *ante* at 35, 697 *A.*2d at 525–26, requires that Norman's petition for post-conviction relief be granted. In my view, the same factors and reasoning justify granting Duncan's petition. I therefore dissent from that portion of the Court's judgment that reverses the grant of Duncan's petition for post-conviction relief.

The Court determines that because Roberts and Pedicini did not formally begin their partnership until after Duncan's trial, the *per se* rule presuming prejudice that we adopted in *State v. Bellucci*, 81 *N.J.* 531, 541–46, 410 *A.*2d 666 (1980), did not apply to these appeals. *Ante* at 29, 697 *A.*2d at 522. The Court's conclusion in that respect is shaky, inasmuch as Roberts identified himself during Duncan's trial as Pedicini's partner, suggesting that whenever the firm formally may have commenced operations Roberts regarded the partnership as sufficiently formalized to acknowledge its existence in open court. But even if the Court defers to the trial court's factfinding about the official commencement of the partnership, the relationship of the lawyers concerning these defendants posed the very same danger and potential for conflict that would have existed had they been partners. The source of their fee was Duncan's bail money, which had been assigned to Roberts, and the record reveals only that Roberts agreed to split his fee with Pedicini. The record is silent about whether either Duncan or Norman authorized that compensation arrangement. Thus, for purposes of evaluating whether *Bellucci*'s *per se* rule should apply, the fee arrangement between defense counsel, who were sharing offices at the time, was the substantial equivalent of a *de facto* partnership. As far as representation of these two defendants was concerned, Roberts and Pedicini were engaged in a joint venture, with a single source of compensation, in which they were obligated effectively to represent different clients with conflicting interests. *Cf. In re Abrams*, 56 *N.J.* 271, 275–76, 266 *A.*2d 275 (1970) (finding inherent conflict of interest and disciplinary violation where attorney representing defendant charged with gambling offense agreed to be paid by defendant's employer whose interests necessarily conflicted with those of defendant).

Moreover, if Roberts' representation of Duncan is evaluated on the basis of an actual prejudice standard, the Court's conclusion is difficult to justify. The Court concedes that the available testimony of Alvin Norman, defendant Norman's brother, that Norman and not Duncan was the shooter would have been admissible at

Duncan's trial. *Ante* at 31, 697 *A*.2d at 523. The Court concludes, however, that even if Alvin had so testified Duncan inevitably would have been convicted of murder as an accomplice, with the result that Roberts' failure to call Alvin did not establish a substantial likelihood of prejudice to Duncan. The Court's conclusion is flawed. In view of the lesser included offenses of aggravated manslaughter, manslaughter, and assault that were presented to the jury during Duncan's trial, the prediction that a jury exposed to Alvin's exculpatory testimony necessarily would have convicted Duncan of murder as an accomplice is too uncertain to support the Court's result. Even with hindsight, an understanding of why Duncan's lawyer did not call Alvin as a witness remains elusive. The Court should not speculate about the jury verdict that would have been returned if Duncan's jury heard Norman's brother testify that Norman admitted killing Holmes. Sufficient evidence to establish the requisite likelihood of prejudice exists on this record to sustain the Appellate Division's disposition of Duncan's petition for post-conviction relief.

*For reversal and remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and COLEMAN—6.

*Concurring in part; Dissenting in part*—Justice STEIN—1.