NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-2150-14T4

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

MELANIE McGUIRE,

 Defendant-Appellant.

____________________________

 Argued March 1, 2017 – Decided August 7, 2017

 Before Judges Fuentes, Carroll and Gooden
 Brown.

 On appeal from the Superior Court of New
 Jersey, Law Division, Middlesex County,
 Indictment No. 05-10-0164.

 Michael A. Priarone, Designated Counsel,
 argued the cause for appellant (Joseph E.
 Krakora, Public Defender, attorney; Mr.
 Priarone, on the brief).

 Daniel I. Bornstein, Deputy Attorney General,
 argued the cause for respondent (Christopher
 S. Porrino, Attorney General, attorney; Mr.
 Bornstein, of counsel and on the brief).

PER CURIAM
 Defendant appeals from the October 2, 2014 order of the trial

court denying her petition for post-conviction relief (PCR)

without granting an evidentiary hearing. We affirm.

 I.

 Following a twenty-six-day jury trial, defendant was

convicted of murder, N.J.S.A. 2C:11-3, second-degree possession

of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a), second-

degree desecration of human remains, N.J.S.A. 2C:22-1, and third-

degree perjury, N.J.S.A. 2C:28-1. She was sentenced to an

aggregate term of life in prison, subject to the provisions of the

No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, plus five years

with a two-and-a-half year period of parole ineligibility. We

previously related the facts in detail in our affirmance on direct

appeal of defendant's 2007 convictions and sentence. State v.

McGuire, 419 N.J. Super. 88 (App. Div.), certif. denied, 208 N.J.

335 (2011). We note only the following salient facts to provide

context for this appeal.

 Defendant, a nurse, plied her husband with chloral hydrate,

fatally shot him, and desecrated his body by cutting it into three

sections, draining the blood and wrapping the body parts in plastic

garbage bags, which were then packed into three matching suitcases

and thrown into the Chesapeake Bay where they were subsequently

found in May 2004. The State's evidence was largely circumstantial

 2 A-2150-14T4
and included incriminating internet searches related to fatal

poisons, gun laws and murder on computers seized from defendant's

home; expert testimony linking the plastic garbage bags containing

the decedent's remains to garbage bags found in defendant's home;

evidence that defendant had purchased a handgun and filled a forged

prescription for chloral hydrate a few days before her husband's

disappearance; and evidence that defendant was having an affair

with a co-worker and planning to leave her husband.

 In 2011, defendant filed a timely pro se PCR petition and was

assigned counsel who moved to compel discovery to support the

petition. Specifically, PCR counsel requested samples of the

garbage bags containing the decedent's body and the garbage bags

taken from defendant's home. Defendant sought to have the garbage

bags re-tested by her expert to demonstrate that the bags came

from different batches in order to establish a prima facie

ineffective assistance of counsel (IAC) claim through trial

counsel's failure to perform the testing. In addition, PCR counsel

requested a copy of the hard drive from a laptop computer recovered

from the decedent's car. Defendant sought to conduct a search of

the decedent's laptop computer for incriminating internet searches

similar to those found on the desktop computers recovered from

defendant's home to establish that the incriminating searches

 3 A-2150-14T4
originated with the decedent and trial counsel was ineffective for

failing to conduct the analysis.

 Judge Bradley J. Ferencz acknowledged that State v. Marshall,

148 N.J. 89, 270 (1997), conferred "discretionary authority" on

the PCR court to order the State to supply defendant with relevant,

non-privileged discovery upon defendant's "presentation of good

cause[,]" but ultimately denied defendant's motion to compel

discovery in a cogent written decision. Judge Ferencz concluded

that "even if the [d]efense were to re-examine the evidence and

determine that the bags were from different batches, or similar

searches were made on the laptop, the defense [could] still not

prove that trial counsel's failure to conduct these tests was

ineffective assistance of counsel."

 Judge Ferencz explained:

 Consider the fact that if trial counsel
 had the garbage bags tested originally, those
 tests may have demonstrated that the bags were
 of the same batch. Then, the defense would
 have no expert to rebut the findings of the
 State's two experts because they could not
 ethically then send an expert to swear to
 testimony they knew to be false, or at least
 disingenuous. Trial counsel made the
 reasonable strategic decision to not risk
 their own expert finding conclusive,
 indisputable evidence that the bags were the
 same. Instead, counsel [chose] to attack the
 credibility and conclusions of the State's
 expert in [an] attempt to undermine their
 findings and find reasonable doubt in the

 4 A-2150-14T4
 State's case. And under Strickland,1 that
 reasonable decision would not amount to
 ineffective assistance of counsel. It in fact
 was a sound strategic position for counsel to
 take. Accordingly, if this issue were to come
 before the [c]ourt on post-conviction relief,
 even with expert findings that the bags were
 from different batches, the [c]ourt could not
 find that it was ineffective assistance of
 counsel for trial counsel to make the
 competent and good strategic decision not to
 have their expert re-test the bags.

 The same holds true of the laptop hard
 drive. At the time of trial[,] defense
 counsel recognized that there was a very good
 chance that the laptop would show . . . no
 incriminating internet searches. Instead [of]
 foreclosing his argument, defense counsel
 legitimately chose to argue the inference that
 [the] laptop could have contained similar
 searches. And the absence of proof, along
 with the defense computer expert's testimony
 that the searches were conducted close in time
 to hits for [the decedent's] favorite
 websites, was favorable testimony to the
 defense that supported their theory of the
 case. Therefore no matter what the defense
 finds as a result of new investigation of the
 requested items, it was still reasonable trial
 strategy at the time of trial and nothing the
 defense can offer from further investigation
 will buttress their ineffective assistance
 claim.

 As to the substantive PCR claims, defendant argued to the PCR

court that she was denied effective assistance of counsel because

trial counsel failed to consult and retain appropriate expert

1
 Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L.
Ed. 2d 674 (1984).

 5 A-2150-14T4
witnesses and failed to call fact witnesses critical to her

defense. Defendant submitted various certifications to support

her claims. Regarding the expert witnesses, defendant argued that

trial counsel failed to call (1) a ballistics expert to counter

the State's evidence that the gun she purchased was consistent

with the bullets recovered from the decedent's body; (2) a

pharmacologist to present an alternate theory for the presence of

chloral hydrate in the decedent's car to counter the State's theory

that defendant used the sedative to sedate the decedent before

shooting him; and (3) an expert in luminol to rebut the State's

contention that defendant could have rid her apartment of all

traces of blood resulting from the murder and dismemberment of the

decedent. In addition, defendant argued that trial counsel failed

to authorize her computer expert to review the entire internet

search history of her home desktop computer to find incriminating

searches attributable to the decedent. Defendant also argued that

trial counsel failed to retain additional experts because a

provision in the supplemental retainer agreement, which reduced

the attorney's fee with the retention of additional experts,

created a conflict of interest and a disincentive to trial counsel

retaining additional experts.

 Regarding the fact witnesses, defendant argued that trial

counsel failed to call (1) her neighbor to testify to the heated

 6 A-2150-14T4
argument she overheard in defendant's apartment; (2) the

maintenance supervisor of her apartment complex to testify to the

lease requirement that walls be returned to white upon termination

of the lease; and (3) co-workers from her workplace, Reproductive

Medical Associates (RMA), to testify that the patient information

computer database could be accessed remotely to create doubt that

she forged the prescription for chloral hydrate. Defendant also

argued that trial counsel failed to present evidence of the

decedent's training in pharmacology to support a claim that he was

using chloral hydrate to combat steroid use. Defendant asserted

that her claims, individually or cumulatively, warranted an

evidentiary hearing.

 In a comprehensive and well-reasoned written decision, Judge

Ferencz determined that defendant failed to establish a prima

facie case of ineffective assistance of counsel under Strickland,

supra, to warrant relief or an evidentiary hearing. Judge Ferencz

concluded defendant failed to show that trial counsel's

representation fell below an objective standard of reasonableness,

and failed to establish a reasonable probability that, but for

counsel's alleged unprofessional errors, the outcome of her trial

would have been different had the witnesses or the evidence been

presented to the jury.

 7 A-2150-14T4
 Initially, Judge Ferencz recounted that, at trial, there were

sixty-four witnesses presented by the State and sixteen additional

witnesses presented by the defense. "Twenty-one of the witnesses

who testified were qualified by the [c]ourt as experts in a variety

of fields and specialties." Judge Ferencz then addressed

defendant's arguments seriatim. First, in rejecting defendant's

argument that trial counsel was ineffective for failing to call a

ballistics expert to contradict the testimony of the State's

experts, Judge Ferencz stated:

 During trial, the State called two ballistics
 experts who testified that the two bullets
 recovered from the victim's body were .38
 Special caliber and had been fired from the
 same firearm, which had six lands and grooves
 that were inclined to the right. [Defendant]
 claims that in preparation for the instant
 petition for post-conviction relief, she
 consulted Dr. Peter De Forest, an expert in
 the field of ballistics. Dr. De Forest,
 unlike the State's experts at trial, "entered
 the specific model number of the gun
 [defendant] purchased" into a search of the
 FBI's general rifling class characteristics,
 producing results for "three Taurus .38
 Specials, Model 85B2," all of which "fired
 bullets with five, not six, lands and
 grooves." [Defendant] maintains that if her
 trial attorneys had consulted with an expert
 such as Dr. De Forest, the expert might have
 established that the particular gun she
 purchased most likely had five lands and
 grooves, whereas the bullets recovered from
 the victim's body had six.

 However, . . . [o]n direct appeal,
 [defendant] made this argument and attempted

 8 A-2150-14T4
to supplement the record with information
obtained from the website of the manufacturer
of the gun she purchased, Taurus International
Manufacturing, Inc. (TIMI). In response, the
State provided the Affidavit of Robert
Morrison, President and Chief Executive
Officer of TIMI. . . .

 Mr. Morrison attested . . . parts and
tools containing five and six lands and
grooves are, and always have been, used
interchangeably in the production of Model 85
handguns; . . . all Model 85 handguns have
either five or six lands and grooves, but
because the factory sometimes uses tools and
parts that [have] five lands and grooves, and
sometimes uses tools and parts that have six
lands and grooves, there is no way of knowing
whether the revolver at issue has five lands
and grooves or six lands and grooves; . . .
because neither the tooling nor the barrels
used in the Model 85 are serialized, it is not
possible to determine the number of lands and
grooves which were cut into the barrel of the
revolver at issue . . . without examining the
weapon itself; . . . defendant's revolver
could have had either five or six lands and
grooves when it left the factory; . . .
although the manufacturer's website indicates
that the revolver at issue . . . had five
grooves, the "technical information listed on
TIMI's website is subject to change and should
not be relied on as accurate;" and . . . the
TIMI website is "under constant revision," and
data on the site contains erroneous
information. . . .

 Without the availability of
[defendant's] gun for inspection, which is the
only way to accurately determine the number
of lands and grooves it contained, expert
testimony such as that of Dr. De Forest lends
no credence to [defendant's] claim[.]

 9 A-2150-14T4
 Next, in rejecting defendant's argument that trial counsel

was ineffective for failing to call a pharmacologist to present

an alternate theory for the presence of chloral hydrate in the

decedent's car, Judge Ferencz noted:

 [Defendant] asserts that in an interview with
 the police, the victim's sister . . . "[t]old
 police that she was concerned about her
 brother's health" because "he had been showing
 signs of what she believed might be steroid
 abuse," such as weight gain, balding, and an
 enlarged head. [Defendant] argues that her
 trial attorneys should have consulted an
 expert such as Dr. David Benjamin, a forensic
 pharmacologist and toxicologist, who
 speculates that if the victim was using GHB
 (gamma hydroxyl-butryrate) for body building
 or other purposes, then he could also have
 been taking chloral hydrate to counteract the
 symptoms of GHB withdrawal. . . .

 [However], there was no evidence
 presented from which a jury could infer that
 the victim was using steroids or GHB.
 Moreover, the victim's sister testified that
 she "had no knowledge of any drug use by [the
 victim]," that he "was not in too good of shape
 anymore," and although he had purchased a
 "weight set" the year before, she did not know
 if he ever "used it." . . . Therefore, it is
 unlikely that an expert witness would have
 been permitted to testify to a wild
 speculation that has no support in the record.

 In rejecting defendant's argument that trial counsel was

ineffective for failing to call an expert in luminol, Judge Ferencz

recounted that, "[d]uring trial, the State addressed the fact that

no bloodstains or other biological evidence was found in the

 10 A-2150-14T4
McGuire apartment by eliciting testimony from forensic scientists"

that "blood and tissue can be cleaned up[.]" Judge Ferencz pointed

out that trial counsel subjected these forensic scientists to

withering cross-examination "in order to highlight the fact that

scientists and forensic investigators have the technological

capability to detect even trace quantities of DNA from blood or

tissue that would otherwise be undetectable to the naked eye."

 Judge Ferencz explained:

 [Defendant's] trial counsel engaged in
 . . . extensive cross-examination for the
 purpose of convincing the jury that the murder
 and dismemberment of [the victim] could not
 have occurred inside the McGuire apartment,
 since multiple searches, utilizing the most
 technologically advanced tools available to a
 forensic scientist, yielded no DNA evidence.
 Accordingly, calling an additional witness
 such as Dr. Benjamin for the purpose of
 testifying to one such tool by name, i.e.,
 luminol, would have been unnecessary and
 perhaps even redundant. . . . [T]he decision
 not to call an expert on luminol was a sound
 trial strategy counsel carefully employed as
 the evidence needed was already before the
 jury, and therefore [defendant] is unable to
 prove that her counsel was ineffective
 pursuant to State v. Arthur, 184 N.J. 307
 (2005).

 In rejecting defendant's argument that trial counsel was

ineffective for not authorizing her computer expert to review the

entire internet search history of her home desktop computer, Judge

Ferencz elaborated:

 11 A-2150-14T4
[Defendant] contends that if her trial
attorneys had authorized a search of the
entire internet history, rather than a limited
search confined to the six-day period reviewed
by the State's expert, they would have
discovered that on January 21, 2004, someone
performed searches for "poison your wife" and
"poison," and someone accessed websites with
the following titles:
"www.unfaithfulwife.net";
www.poisonprevention.org"; and
www.poison.org".

 However, this argument also fails to
establish a prima facie case of ineffective
assistance of counsel. First, the existence
of those searches on the computer in no way
proves that [the victim] conducted them, or
that [defendant] did not. As the State's
computer experts testified, "one of the most
difficult parts of computer forensics is
trying to put someone at the keyboard," and
that there is "no way of knowing whether
someone else in the household jumped on the
computer for a few minutes to do a search and
then let the prior person return to what they
were doing." . . .

 Lastly, and most significantly,
[defendant] fails to appreciate that the
decision to limit the search to the six-day
timeframe prior to the murder was most likely
a strategic one. At trial, [defendant's]
counsel was able to challenge the State's
contentions regarding the incriminating
searches found on the computer by presenting
an expert of their own. This defense witness
testified that some of these incriminating
searches were made within minutes of other
searches, thus supporting defense counsel's
argument that the searches were more likely
to have been conducted by [the victim].
Authorizing a search of the entire internet
history on the McGuire computer could have
undercut this defense insofar as it could have

 12 A-2150-14T4
 revealed other incriminating evidence linking
 [defendant] to the crime. This was a risk
 trial counsel most likely did not wish to
 take, and accordingly the decision to limit
 the search constituted sound trial strategy
 pursuant to State v. Arthur[, supra].

 In addressing defendant's supplemental retainer agreement

conflict of interest argument, Judge Ferencz distinguished State

v. Norman, 151 N.J. 5 (1977), cert. denied, 534 U.S. 919, 122 S.

Ct. 269, 151 L. Ed. 2d 197 (2001), where our Supreme Court granted

defendant's PCR petition. There, the Court recognized that "the

unusual fee arrangement" whereby defendant's attorney fees were

paid by a co-defendant who could be implicated by the defendant's

testimony created "a significant conflict [of interest] and strong

likelihood of prejudice." Id. at 34-36.

 Here, Judge Ferencz expounded:

 Under the terms of the supplemental agreement,
 [defendant] contends, "the cost of retaining
 experts diminishes the size of the fee for the
 attorney," arguably creating a disincentive
 for her trial counsel to expend the funds on
 additional witnesses and investigation and
 producing an inherent conflict of interest.

 Nevertheless, there is no legal authority
 that supports [defendant's] argument that a
 retainer agreement of this sort creates a
 conflict of interest and rises to the level
 of constitutional ineffective assistance of
 counsel. . . . Moreover, [defendant] is unable
 to show that she suffered any prejudice from
 the retainer agreement. In the first
 instance, the supplemental agreement was
 signed on March 9, 2007, after [defendant's]

 13 A-2150-14T4
 trial was already underway. At this point,
 the State and [d]efense would have already
 completed their review of discovery and their
 pretrial investigation, and would have
 submitted their respective lists of witnesses.
 However, even assuming that the [d]efense
 would have pursued additional witnesses as
 [defendant] argues, she has not included any
 certification from her trial counsel
 indicating that they were concerned that
 hiring additional expert witnesses could
 reduce the pool of money from which they would
 be paid, or that they actually failed to
 retain additional experts because of
 insufficient funds. Accordingly,
 [defendant's] argument is too vague and
 speculative to warrant an evidentiary hearing.
 Moreover, should [defendant] have run out of
 funds, counsel could have petitioned the
 Office of the Public Defender for ancillary
 services.

 Turning to defendant's argument that trial counsel was

ineffective for failing to call her neighbor as a witness to

corroborate her account "that she had gotten into a heated argument

with the victim which caused him to leave the apartment and abandon

her and her children[,]" Judge Ferencz concluded that given "the

weak testimony [her neighbor] would have provided," trial

counsel's decision constituted sound trial strategy. According

to Judge Ferencz, although her neighbor told police "she was

awakened in the early morning hours because she heard a loud

argument[,]" her neighbor "could not recall the exact date when

she heard this argument, nor could she identify precisely where

it was coming from," nor the identity of "the second voice as

 14 A-2150-14T4
being positively male or female[.]" Moreover, her neighbor "stated

that because she did not speak fluent English, she could not

understand everything that was said."

 Judge Ferencz explained that instead of calling her neighbor

to the stand,

 defense counsel cleverly elicited parts of
 [her neighbor's] statement that inured to the
 [benefit of the] defense through the testimony
 of Sergeant Dalrymple. Specifically, defense
 counsel highlighted for the jury, through Sgt.
 Dalrymple, the fact that [her neighbor] heard
 an argument coming from the McGuire apartment,
 and urged the jurors to draw an inference that
 this corroborated the [defendant's] version of
 what occurred. Defense counsel's strategy in
 not calling [her neighbor], who would then be
 subject to rigorous cross-examination, but
 rather eliciting the helpful aspects of her
 statement, was reasonable under the
 circumstances. Indeed, [her neighbor's]
 testimony may have led a jury to believe that
 [defendant] had fought with the victim and
 that the argument precipitated the murder.

 Likewise, Judge Ferencz rejected defendant's contention that

trial counsel was ineffective for failing to call the maintenance

supervisor of defendant's apartment complex "to testify to the

lease requirement that walls must be returned to a white or

eggshell color before a tenant vacates an apartment." Judge

Ferencz acknowledged that defendant believed "the testimony . . .

together with the written lease agreement, could have neutralized

[the] inference and rebutted the State's contention that

 15 A-2150-14T4
[defendant] repainted the walls" in order to "conceal the evidence

of her crimes."

 However, Judge Ferencz pointed out:

 What was significant in [defendant's] case was
 not that the walls had been re-painted, but
 the fact that the entire Woodbridge apartment
 had been bleached, scrubbed and painstakingly
 cleaned to eliminate all traces of DNA
 evidence. As most lease agreements require
 tenants to leave the premises in "broom clean"
 condition, this fact would certainly have been
 raised by the State on cross-examination of
 [the Maintenance Supervisor] to highlight the
 excessiveness of [defendant's] "cleaning."
 Therefore, defense counsel's decision not to
 call [the Maintenance Supervisor] as a witness
 was a sound strategy in light of the fact that
 his testimony would have done very little, if
 anything, to help the [d]efense, and would,
 in fact, have opened the door to potentially
 more incriminating testimony.

 Similarly, Judge Ferencz rejected defendant's argument that

trial counsel was ineffective for failing to call co-workers from

RMA to testify that the patient information computer database

could be accessed remotely. Although defendant maintained that

this information would have "undermined the State's argument that

only [she] had access to the patient information necessary to

produce [the chloral hydrate] prescription," and would have shown

that "it could have been written by [the victim,]" Judge Ferencz

highlighted the flaw in defendant's logic thusly:

 First, eliciting such testimony from the RMA
 witnesses would not have proven that [the

 16 A-2150-14T4
victim] accessed the information, since it was
password-protected and accessible only by the
doctors and nurses who worked for RMA.
Instead, this testimony would have confirmed
that [defendant] had additional ways of
obtaining the patient's information, outside
of [RMA's] offices. However, even assuming
that [the victim] had somehow gained access
to the remote database, this evidence still
would not account for the fact that
[defendant] was the one with access to the RMA
prescription forms, and that nurses at RMA
routinely filled such forms out. In addition,
this testimony would also not account for the
plethora of evidence presented showing that
[defendant] was the one who filled the
prescription. Of particular note is the fact
that (1) [defendant] was a fertility nurse at
RMA with access to the RMA prescription pads;
(2) the prescription for chloral hydrate was
signed by . . . [defendant's] paramour, and
filled in the name of one of [her paramour's]
fertility patients; (3) the forged
prescription was filled at the Walgreens
pharmacy on the same day the victim
disappeared; (4) the Walgreens pharmacy was
located approximately eight minutes away from
the daycare facility where [defendant]
routinely brought her sons; (5) records
indicate that the prescription was filled
approximately twelve minutes after
[defendant] dropped her sons off at daycare
. . . .

 Given the overwhelming evidence proving
that it was [defendant] who forged and filled
the prescription for chloral hydrate, it is
unreasonable to believe that presenting
testimony from the RMA witnesses to a jury
would have persuaded them otherwise.

 17 A-2150-14T4
 Finally, in rejecting defendant's contention that trial

counsel was ineffective for failing to present evidence of the

decedent's training in pharmacology, Judge Ferencz noted:

 [Defendant] maintains that had her trial
 counsel properly investigated, they would have
 discovered that [the victim] attended the
 Rutgers University School of Pharmacy from
 1991 to 1994, which would have given him the
 "pharmacological knowledge to prescribe
 chloral hydrate for symptoms of GHB
 withdrawal" as well as "the technical
 expertise to write the prescription."
 [Defendant] contends that had this information
 been presented to the jury, it would have
 undermined the State's argument that only she
 would have known the sedative properties of
 chloral hydrate or had the ability to forge
 such a prescription.

 However, it is unlikely that presentation
 of this evidence would have refuted the
 State's proofs that [defendant] was the one
 who filled the forged prescription for chloral
 hydrate. Moreover, it is unreasonable to
 think that the jury would have been persuaded
 by the evidence, given the fact that nothing
 in the record suggests that [the victim] was
 using GHB or suffering from GHB withdrawal.
 Regardless of any "pharmacological knowledge"
 [the victim] may have obtained ten years prior
 to his murder, the record is replete with
 evidence that [defendant] had not only the
 training to prepare and fill the prescription,
 but also the motive and the access to do so.
 Moreover, any "pharmacological knowledge" on
 the part of [the victim] does not explain the
 internet searches discovered on the McGuire
 computer, which included search results for
 not only "chloral hydrate," but also
 "undetectable poisons," "how to purchase
 hunting rifles in [New Jersey]," "gun laws in
 Pennsylvania," and "how to commit murder."

 18 A-2150-14T4
 This appeal followed. Defendant presents the following

arguments for our consideration:

 I. THE TRIAL COURT ERRED IN DENYING
 DEFENDANT'S MOTION TO EXAMINE AND TEST A
 COMPUTER AND GARBAGE BAGS HELD AS EVIDENCE BY
 THE STATE.

 II. THE TRIAL COURT ERRED IN DENYING
 DEFENDANT'S PETITION FOR POST CONVICTION
 RELIEF WITHOUT AN EVIDENTIARY HEARING ON
 DEFENDANT'S CLAIMS.

 II.

 We review the PCR court's findings of fact under a clear

error standard, and conclusions of law under a de novo standard.

See State v. Harris, 181 N.J. 391, 420-21 (2004), cert. denied,

545 U.S. 1145, 125 S. Ct. 2973, 162 L. Ed. 2d 898 (2005). Where

the PCR court's findings of fact are based on "live witness

testimony" we review such findings to determine whether they are

supported by sufficient credible evidence in the record. State

v. Nash, 212 N.J. 518, 540 (2013). However, where, as in this

case, "no evidentiary hearing has been held, we 'may exercise de

novo review over the factual inferences drawn from the documentary

record by the [PCR judge].'" State v. Reevey, 417 N.J. Super.

134, 146-47 (App. Div. 2010) (quoting Harris, supra, 181 N.J. at

421), certif. denied, 206 N.J. 64 (2011). While "[a]ssessing IAC

 19 A-2150-14T4
claims involves matters of fact, . . . the ultimate determination

is one of law[.]" Harris, supra, 181 N.J. at 419.

 Defendant renews the arguments presented to the PCR court and

asserts that the court erred in denying her motion for discovery

and an evidentiary hearing on her claims of ineffective assistance

of trial counsel. We disagree. Judge Ferencz thoughtfully

addressed each of defendant's arguments in his comprehensive

written decisions. After reviewing these arguments in light of

the record and applicable legal principles, we conclude they are

without merit. We affirm substantially for the reasons set forth

in Judge Ferencz' decisions. We add only the following brief

comments.

 "[O]ur Court Rules . . . do not contain any provision

authorizing discovery in PCR proceedings." Marshall, supra, 148

N.J. at 268. "PCR is not a device for investigating possible

claims, but a means for vindicating actual claims[,]" and thus

"[t]here is no postconviction right to fish through official files

for belated grounds of attack on the judgment, or to confirm mere

speculation or hope that a basis for collateral relief may exist."

Id. at 270 (quotations and citations omitted). Nonetheless, "where

a defendant presents the PCR court with good cause to order the

State to supply the defendant with discovery that is relevant to

 20 A-2150-14T4
the defendant's case and not privileged, the court has the

discretionary authority to grant relief." Ibid.

 The mere raising of a claim for PCR does not entitle the

defendant to an evidentiary hearing. State v. Cummings, 321 N.J.

Super. 154, 170 (App. Div.), certif. denied, 162 N.J. 199 (1999).

Rather, trial courts should grant evidentiary hearings only if the

defendant has presented a prima facie claim of ineffective

assistance, material issues of disputed fact lie outside the

record, and resolution of the issues necessitate a hearing. R.

3:22-10(b); State v. Porter, 216 N.J. 343, 355 (2013), certif.

denied, 228 N.J. 502 (2017). "Rule 3:22-10 recognizes judicial

discretion to conduct such hearings." State v. Preciose, 129 N.J.

451, 462 (1992).

 A PCR court deciding whether to grant an evidentiary hearing

"should view the facts in the light most favorable to a defendant

to determine whether a defendant has established a prima facie

claim." Preciose, supra, 129 N.J. at 462-63. "To establish a

prima facie claim of ineffective assistance of counsel, a defendant

must demonstrate the reasonable likelihood of succeeding under the

test set forth in [Strickland, supra, 466 U.S. at 694, 104 S. Ct.

at 2068, 80 L. Ed. 2d at 698], and United States v. Cronic, 466

U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), which [our

 21 A-2150-14T4
Supreme Court] adopted in State v. Fritz, 105 N.J. 42, 58 (1987)."

Id. at 463.

 Under the Strickland standard, a defendant must make a two-

part showing. Supra, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L.

Ed. 2d at 693. A defendant must show that trial counsel's

performance was both deficient and prejudicial. State v. Martini,

160 N.J. 248, 264 (1999). The performance of counsel is

"deficient" if it falls "below an objective standard of

reasonableness" measured by "prevailing professional norms."

Strickland, supra, 466 U.S. at 687-88, 104 S. Ct. at 2064-65, 80

L. Ed. 2d at 693-94. This standard of "reasonable competence,"

Fritz, supra, 105 N.J. at 60, "does not require the best of

attorneys[.]" State v. Davis, 116 N.J. 341, 351 (1989).

 A defendant must also show that the deficient performance

prejudiced the defense. "'This requires showing that counsel's

errors were so serious as to deprive the defendant of a fair trial,

a trial whose result is reliable.'" Fritz, supra, 105 N.J. at 52

(quoting Strickland, supra, 466 U.S. at 687, 104 S. Ct. at 2064,

80 L. Ed. 2d at 693). In determining whether defense counsel's

alleged deficient performance prejudiced the defense, "[i]t is not

enough for the defendant to show that the errors had some

conceivable effect on the outcome of the proceeding." Strickland,

supra, 466 U.S. at 693, 104 S. Ct. at 2067, 80 L. Ed. 2d at 697.

 22 A-2150-14T4
 Rather, defendant bears the burden of showing that "there is

a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different.

A reasonable probability is a probability sufficient to undermine

confidence in the outcome." Id. at 694, 104 S. Ct. at 2068, 80

L. Ed. 2d at 698; see also Harris, supra, 181 N.J. at 432. In

making a prejudice finding, the PCR court must consider "the

totality of the evidence before the judge or jury" and "a verdict

or conclusion only weakly supported by the record is more likely

to have been affected by errors than one with overwhelming record

support." Strickland, supra, 466 U.S. at 695-96, 104 S. Ct. at

2069, 80 L. Ed. 2d at 698-99.

 "'Unless a defendant makes both showings, it cannot be said

that the conviction . . . resulted from a breakdown in the

adversary process that renders the result unreliable.'" Fritz,

supra, 105 N.J. at 52 (quoting Strickland, supra, 466 U.S. at 687,

104 S. Ct. at 2064, 80 L. Ed. 2d at 693). Defendant bears the

burden of proving both elements of an ineffective assistance of

counsel claim by a preponderance of the evidence. State v. Gaitan,

209 N.J. 339, 350 (2012), cert. denied, ___ U.S. ___, 133 S. Ct.

1454, 185 L. Ed. 2d 361 (2013).

 Because of the inherent difficulties in evaluating a defense

counsel's tactical decisions from his or her perspective during

 23 A-2150-14T4
trial, "a court must indulge a strong presumption that counsel's

conduct falls within the wide range of reasonable professional

assistance; that is, the defendant must overcome the presumption

that, under the circumstances, the challenged action 'might be

considered sound trial strategy.'" Strickland, supra, 466 U.S.

at 689, 104 S. Ct. at 2065, 80 L. Ed. at 694-95 (quoting Michel

v. Louisiana, 350 U.S. 91, 101, 76 S. Ct. 158, 164, 100 L. Ed. 83,

93 (1955)). It is well established that "[i]n matters of trial

strategy, we accord great deference to the decisions of counsel[.]"

State v. Biegenwald, 126 N.J. 1, 56 (1991).

 It is axiomatic that one of the most difficult strategic

decisions that any trial attorney must confront is determining

which witnesses to call to the stand. State v. Arthur, 184 N.J.

307, 320 (2005).

 A trial attorney must consider what testimony
 a witness can be expected to give, whether the
 witness's testimony will be subject to
 effective impeachment by prior inconsistent
 statements or other means, whether the witness
 is likely to contradict the testimony of other
 witnesses the attorney intends to present and
 thereby undermine their credibility, whether
 the trier of fact is likely to find the witness
 credible, and a variety of other tangible and
 intangible factors.

 [Id. at 320-21.]

 Therefore, like other aspects of trial representation, a

defense attorney's decision concerning which witnesses to call to

 24 A-2150-14T4
the stand is "an art," and a court's review of such a decision

should be "highly deferential." Strickland, supra, 466 U.S. at

689, 693, 104 S. Ct. at 2065, 2067, 80 L. Ed. 2d at 694, 697.

Judged by these standards, we agree that defendant failed to

demonstrate "good cause" to compel the State to supply defendant

with discovery, Marshall, supra, 148 N.J. at 270, and failed to

establish a prima facie case of ineffective assistance of counsel

under Strickland to warrant an evidentiary hearing. Preciose,

supra, 129 N.J. at 462.

 Affirmed.

 25 A-2150-14T4