**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2232-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JONATHAN JAMES, a/k/a
JONATHAN S. JAMES, and
JOHNATHAN JAMES,

     Defendant-Appellant.

_____

Submitted January 17, 2024 – Decided March 4, 2024

Before Judges Haas and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 12-09-0683.

Joseph E. Krakora, Public Defender, attorney for appellant (Andrew Robert Burroughs, Designated Counsel, on the briefs).

William A. Daniel, Union County Prosecutor, attorney for respondent (Meredith L. Balo, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Jonathan James appeals from a February 28, 2022 order denying his petition for post-conviction relief (PCR) without an evidentiary hearing. We affirm.

I.

To provide context for our opinion, we refer, in part, to the recitation of facts set forth in our unpublished opinion affirming defendant's conviction for first-degree murder, N.J.S.A. 2C:11-3a(1) and (2), and attempted first-degree murder, N.J.S.A. 2C:5-1 and 2C:11-3a(1) and (2), and his resulting aggregate forty-three-year sentence. See State v. James, No. A-3880-16 (App. Div. Sept. 18, 2019) (slip op.), certif. denied, 240 N.J. 562 (2020).

Defendant's convictions stemmed from a March 23, 2012 shooting resulting in the death of Orlando Hernandez and the injury of Antonio Hernandez. Id. at 1-2. More specifically:

> [l]ate in the evening of March 23, 2012, Antonio[1] and a male and female acquaintance [Andrew Davila and Giovanna Alzate] were standing on a sidewalk in front of a housing complex in Elizabeth. Orlando, who Antonio knew, approached, and the two men greeted each other with a hug. At that point, several shots rang out, and everyone ran. Bullets struck Antonio in the

---

[1] To avoid confusion, we use the first names of the two victims, intending no disrespect by this informality.

arm and lower back. At the time, he did not know Orlando was fatally wounded by a gunshot to the head. Antonio described the shooter standing behind Orlando as "possibly . . . African-American" and wearing a "dark-colored sweater[,]" but otherwise he could not identify the man.

Elizabeth Police Officers Jose Montilla and Rony Cruz were on patrol when they heard shots fired. As Montilla exited his police car, he saw people running. "[A] tall [b]lack male" wearing a "dark-colored top, sweater, with jeans" ran toward Montilla. Montilla ordered the man to stop, but he ignored the command, and Montilla gave chase. When the man ran down the driveway of a house, Montilla stopped and "could hear [the man] going through the backyards." Montilla broadcasted the direction of flight, telling other officers near the scene "where . . . [the man] was going to come out if he was to continue running." . . .

Detective Jose Martinez saw defendant "running from in between two houses[,]" apprehended him, and asked for assistance from any officer who could identify the suspect. Montilla responded and identified defendant as the person he had earlier chased. Defendant now wore a white t-shirt and had a car key, along with other keys, in his pocket. Martinez searched the area and found "a black sweatshirt on the ground" near a stockade fence where he had seen defendant running. Another police officer found defendant's wallet in one of the backyards, and Cruz found a .32 caliber revolver on the front lawn of one of the nearby homes. Subsequent ballistic testing revealed the gun fired the shot that killed Orlando and wounded Antonio, and that one of the unfired cartridges demonstrated a "'light'

3

primer strike," i.e., signifying the "firing pin struck the primer" but with insufficient force "to actually fire the cartridge."

After his arrest, defendant and Alexis Feliciano were housed in the same area of the Union County Jail, discussing what charges each faced. Feliciano saw a copy of defendant's criminal complaint, and told him that he knew Orlando, having grown up with his family, and Antonio, who Feliciano knew from "seeing him around." Defendant explained to Feliciano that he drove by the group of people, saw Antonio, parked his car, walked toward him, and fired. Defendant told Feliciano he did not plan to shoot Orlando but did "because he was there." Defendant said the .32 caliber gun "jammed," and he threw it away before police apprehended him.

While in custody the morning after his arrest, defendant also called his sister in Hillside. He told her where he had parked the family car in Elizabeth and asked her to retrieve it. The car was parked on the same street where the murder occurred.

The sweatshirt police found near the fence contained DNA evidence on its left cuff. The State's expert, Monica Ghannam, an employee of the Union County Prosecutor's Office . . . Forensic Laboratory, opined defendant was a major contributor to this DNA, and the probability of randomly selecting someone in the African-American population with the same DNA profile was 1-in-690 quintillion. In addition . . . Ghannam obtained a "low level" of DNA evidence from the hammer of the revolver. She opined that defendant could not be excluded as a contributor to the sample,

4

and the probability of randomly selecting a member of the African-American population with a similar DNA profile, the random match probability (RMP), was one-in-eighteen. Defendant did not call any witnesses or testify.

[Id. (slip op. at 2-5) (fourth through ninth and eleventh alterations in original).]

Feliciano and Antonio, who were apparently both incarcerated on unknown charges at the same facility in September 2012, wrote letters to defendant before the trial, dated July 26, 2014 and November 1, 2015, respectively. Feliciano stated he "did some BS"; he was "wrong," and he wanted "to fix that mistake." He also stated the "pigs haven't contact[ed]" him, but if they did he would "deny everything." However, Feliciano also stated he could only speak for himself and, as far as he knew, Antonio was "proceed[ing] with the process." In his letter, Antonio stated "I'll have to speak with a criminal investigator so I can recant." He then explained it would cost between $300 to $500 to hire the investigator. Defendant's trial counsel did not seek to introduce these letters at trial nor did she cross-examine either witness about them.

As noted, the jury convicted defendant of first-degree murder and first-degree attempted murder. Thereafter, defendant moved for a new trial, arguing

5

the Portuguese interpreter who translated trial witness Carlos Cristo's[2] testimony did so incorrectly and thus deprived him of due process and a fair trial. After reviewing a secondary translation of Cristo's testimony by a master interpreter, the court denied the motion, concluding any variances in interpretation did not "present a manifest denial of justice." It then sentenced defendant to an aggregate custodial term of forty-three years, with over thirty years of parole ineligibility.

We affirmed defendant's convictions and sentence. In our opinion, we rejected his arguments (1) he was denied a fair trial when the court permitted the State to present expert testimony about the DNA found on the gun, and (2) the court improperly imposed a consecutive sentence. See James, slip op. at 1-2.

---

[2] Carlos Cristo testified that on the night of the shooting, he arrived home with his family when a Hispanic man, wearing gray clothing and with red eyes, approached him to ask for money. Cristo stated shortly thereafter he heard gunshots and observed a man with dark skin, slightly taller than his height of six feet, making shooting movements. He observed people running from the scene but did not identify defendant as the shooter. As Portuguese was Cristo's native language, a Portuguese interpreter was used to translate his trial testimony. A Portuguese-speaking juror subsequently advised the court the interpreter was "bad at describing what [Cristo] was saying" and the interpretation was "different."

Defendant thereafter filed the instant timely PCR petition, supported by two supplemental briefs.[3] In briefs filed by appointed counsel, he contended both trial and appellate counsel were ineffective.

Defendant specifically asserted trial counsel failed to call Marc Stuckey as a witness.[4] He also argued trial counsel failed to cross-examine Antonio and Feliciano with their letters, which he characterized as demonstrating a conspiracy to extort him in exchange for favorable testimony. Relatedly, he contended counsel conducted an insufficient investigation when he failed to discover Antonio and Feliciano were incarcerated together in fall 2012, purportedly providing an opportunity for them to conspire.

Defendant further argued his trial counsel was constitutionally ineffective by failing to request the correct identification charge, the Model Jury Charge

---

[3] Before us, defendant has not asserted all the arguments he raised in his petition and briefs. For purposes of conciseness, we address only those arguments which defendant challenges before us. As he has failed to reprise the remaining ineffective assistance of counsel claims presented to the court, we accordingly deem those unbriefed arguments waived. See State v. Zingis, 471 N.J. Super. 590, 599 n. 4 (App. Div. 2022) (noting "[a]n issue not briefed is deemed waived" (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2022))).

[4] Stuckey stated to police he saw a man wearing a black hooded jacket urinating next to a car just prior to the shooting and the same car drive slowly past the scene afterward.

titled "Identification: In-Court and Out-of-Court Identification." He also asserted his trial counsel previously represented Davila in an unrelated matter that created a prejudicial conflict of interest, as evidenced by his counsel's failure to investigate Davila, consider calling him to testify, or argue he was responsible for the shooting, despite evidence indicating his appearance was consistent with witness descriptions of the shooter. Defendant also contended appellate counsel was ineffective for failing to challenge the denial of his motion for a new trial based on the inadequacy of the court-appointed Portuguese interpreter who interpreted Cristo's testimony.

Defendant subsequently submitted a counseled letter brief and submitted further evidence in support of his claim Antonio attempted to extort him in exchange for favorable testimony. He specifically provided the certification of his girlfriend, Sonya Marquez, and a transcript of Marquez's recorded conversations with Antonio in July 2021. Marquez certified Antonio "asked [her] to pay him money in exchange for his testimony saying that [defendant] was not the person who shot him." The attached transcripts, however, reflected Antonio ambiguously agreed to provide "a written affidavit" in exchange for "ten," presumably referring to ten thousand dollars based on another portion of the transcripts, "as to whether or not we was in the unit together." Further,

8

Antonio stated he was "not interested" and "not really into" appearing in court if defendant were granted a new trial. Defendant also requested the opportunity to file an additional brief challenging the DNA evidence against him pursuant to our then-newly issued opinion in State v. Rochat, 470 N.J. Super. 392 (App. Div. 2022).

In a thorough written order, Judge Thomas K. Isenhour denied defendant's petition without an evidentiary hearing, concluding defendant failed to satisfy either of the two prongs set forth in Strickland v. Washington, 466 U.S. 668, 687 (1984).[5] The judge also concluded because defendant failed to establish a prima facie case under Strickland, an evidentiary hearing was not warranted.

Judge Isenhour determined defendant's counsel was not ineffective for failing to call Stuckey as a witness because Stuckey's statement did not support the inference the person Stuckey saw wearing a hooded jacket was responsible for the shooting. Further, he found even if counsel was deficient by failing to

---

[5] To establish ineffective assistance of counsel, a convicted defendant must satisfy the two-part test enunciated in Strickland, 466 U.S. at 687, by demonstrating that: 1) counsel's performance was deficient, and 2) the deficient performance actually prejudiced the accused's defense. The Strickland test has been adopted for application under our State constitution. See State v. Fritz, 105 N.J. 42, 58 (1987).

call him, such failure "would not have changed the outcome given the totality of evidence against defendant."

The judge also rejected "[d]efendant's contention that counsel had a conflict of interest [as] . . . merely speculative." Judge Isenhour acknowledged defendant's trial counsel was listed as Davila's attorney on two prior occasions, but the record did not reflect whether counsel was assigned to represent Davila or "merely standing in for another member of [the Public Defender's] Office." Additionally, the judge found the representation was not extensive, as one of the appearances was postponed and characterized as a "[p]lea [d]isp [c]onference" and the other was a "[p]re-[a]rraign conference" with a notation that discovery was exchanged.

Judge Isenhour also reasoned counsel's decision not to call Davila may have been strategic, as his testimony "would only have drawn attention to a consistency, i.e., that Davila was leaving the scene before shots were fired." On this point, the judge found Davila's statement "that the shooter was wearing a black jacket [wa]s just as likely to have been considered inculpatory when considered with the descriptions provided by other witnesses," who all maintained the shooter's top was "dark and/or black." Additionally, the judge noted defendant did not need to call Davila to testify in order to argue his

clothing was consistent with the shooter's, as Antonio testified Davila was also wearing a black hoodie. In essence, the judge concluded defendant's counsel's decision not to call Davila did not prejudice him as his proposed testimony "would [not] have reasonably led to a different outcome."

Next, Judge Isenhour found defendant's claim regarding counsel's failure to request an identification charge was "meritless" because "the trial judge adequately placed this central issue of identity of the shooter before the jury." He noted although defendant argued the Model Jury Charge titled "Identification: In-Court and Out-of-Court Identification" should have been given, he also conceded "no witness—either out of court or in court—identified [defendant] as the shooter." Thus, the judge concluded the trial judge gave the correct Model Jury Charge, titled "Identification: No In- or Out-of-Court Identification," and he could not "find that trial counsel was ineffective by not requesting a lengthier charge," which did not apply to these facts.

Judge Isenhour found "[w]ithout more, [he] [could] not find . . . trial counsel's failure to cross-examine Feliciano and Antonio . . . regarding the contents of the letters constitutes ineffectiveness" as the cross-examination could have opened the door to unfavorable testimony about defendant's alleged gang activity and criminal history, and defendant lacked competent evidence to

11

contradict the witnesses' potential denials. Rather, the judge concluded "trial counsel's strategic choice to not cross-examine the two witnesses regarding their letters was objectively reasonable and within the range of reasonable professional assistance."

The judge found cross-examination on Feliciano's letter could have led to Feliciano explaining "the wrong he committed was testifying against a gang member, someone who was from the same criminal milieu as defendant, and that he violated a street code by cooperating with law enforcement or the State." In support, the judge pointed to an "extensive colloquy" between counsel and the trial court with regard to limitations on Feliciano's testimony, after which "Feliciano was instructed not to reference gang affiliation or his familiarity with defendant because of their attendance at gang meetings" or "knowing defendant from Jamesburg Correctional Facility." Further, the judge found "even if Feliciano did recant, and testify he fabricated his account" to police, "the State likely would have introduced Feliciano's prior statement [to police] . . . and cross-examined him as to his gang affiliation, knowledge of defendant's gang affiliation, and prior knowledge of defendant under N.J.R.E. 404(b)."

The judge also determined Antonio's letter and use of the word "recant" was "ambiguous," given he never identified defendant to police or at trial. He

noted Antonio's testimony was "extremely brief" and "he was likely a better witness for the defense than the State" because he "did not remember seeing who shot him, and initially could not describe any characteristics of the shooter." Given the uncertainty of his answers and the potential the jury could find the letters constituted evidence of collusion between defendant and Antonio rather than Antonio's extortion of defendant, the judge determined counsel's failure to cross-examine Antonio regarding his letter to defendant was a strategic choice.

Additionally, Judge Isenhour found defendant's claims regarding Feliciano and Antonio's alleged extortion conspiracy were "vague, conclusory, and [thus did] not warrant consideration." Even if true, the judge explained the fact that Feliciano and Antonio were housed together while incarcerated in 2012 would not have affected the trial outcome as Antonio never identified defendant to police or at trial but only provided a description that matched the other witnesses' testimony, and defendant presented no further competent evidence supporting any extortion conspiracy.

Judge Isenhour noted Marquez's certification detailed conversations with Antonio in 2021, constituting evidence "not in existence at the time of either defendant's trial or even his initial pro se PCR submission." Thus, he concluded "the newly acquired evidence is more appropriately analyzed under a motion for

a new trial analysis" but defendant did not file such a motion or "address it in that fashion." Nevertheless, the judge found the certification did not substantially support defendant's claim of Antonio and Feliciano's extortion conspiracy as the transcript of Marquez's conversation with Antonio reflected he did not "agree to testify"; "agree, acknowledge, or state that defendant was not the shooter"; or make any statement indicating he had "any knowledge of defendant's alleged admissions to Feliciano."

Finally, Judge Isenhour rejected defendant's claims of ineffective assistance of his appellate counsel based on his failure to challenge the adequacy of the Portuguese interpreter for Cristo's testimony, as the issue was "litigated extensively at the trial level" when defendant moved for a new trial. Given what the judge characterized as "counsel's strategic discretion," and the absence of "compelling evidence to suggest the fruitful nature of this claim," he concluded he could not "find that [appellate] counsel's performance fell below an objective standard of reasonableness" or that "the outcome of defendant's direct appeal would have been different."

The court did not address defendant's request to brief an additional claim concerning the DNA evidence against him in light of Rochat. After defendant

filed his notice of appeal, we denied his motion for a limited remand for the court to rule on his request to brief the DNA claim.

Before us, he raises the following contentions:

I. AS DEFENDANT HAD SHOWN THAT HE RECEIVED INEFFECTIVE OF ASSISTANCE OF TRIAL COUNSEL AND THAT HE HAD BEEN PREJUDICED THEREBY, THE PCR COURT ERRED BY DENYING HIS PCR PETITION WITHOUT AN EVIDENTIARY HEARING.

A. Trial counsel's failure to investigate and call Marc Stuckey as an exculpatory witness[] w[as] prejudicial as it denied defendant the right to a complete defense.

B. Trial counsel's failure to adequately cross-examine and impeach Alex Feliciano and Antonio Hernandez with incriminating letters that they wrote to defendant before trial was prejudicial.

C. Trial counsel failed to adequately investigate the case to discover that two State witnesses who had sought to extort defendant in exchange for favorable testimony had been housed together in the same facility.

D. Trial counsel had a disqualifying conflict-of-interest as she had previously represented a potential defense witness Andrew Davila.

E. Trial counsel failed to request an identification charge.

15

F. Trial counsel's cumulative errors denied defendant effective legal representation.

II.   APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO ARGUE THAT DEFENDANT WAS DENIED A FAIR TRIAL DUE TO THE INADEQUACY OF THE COURT APPOINTED PORTUGESE INTERPRETER USED AT TRIAL.

III.  AS THERE WERE GENUINE ISSUES OF MATERIAL FACT IN DISPUTE, THE PCR COURT ERRED BY DENYING DEFENDANT'S PCR PETITION WITHOUT AN EVIDENTIARY HEARING.

IV.   THE MATTER SHOULD BE REMANDED SO THAT THE PCR COURT MAY HEAR ARGUMENT AND CONSIDER DEFENDANT'S CLAIM THAT HE IS ENTITLED TO A NEW TRIAL PURSUANT TO STATE V. ROCHAT, 470 N.J. SUPER. 392 (APP. DIV. 2022).

II.

We review the legal conclusions of a PCR court de novo. State v. Harris, 181 N.J. 391, 419 (2004). The de novo standard of review also applies to mixed questions of fact and law. Id. at 420. Where, as here, the PCR court does not conduct an evidentiary hearing, it is within our authority "to conduct a de novo review of both the factual findings and legal conclusions of the PCR court." Id. at 421. A defendant's right to an evidentiary hearing is not automatic, see State v. Preciose, 129 N.J. 451, 462 (1992), but courts should conduct a hearing when

16

"the defendant has presented a prima facie claim of ineffective assistance of counsel under the Strickland two-pronged test, material issues of disputed fact lie outside the record, resolution of the issues necessitate a hearing . . . and 'when the attorney's testimony may be required.'" State v. L.G.-M., 462 N.J. Super. 357, 364-65 (App. Div. 2020) (quoting Preciose, 129 N.J. at 462).

When petitioning for PCR, the defendant must establish, by a preponderance of the credible evidence, that they are entitled to the requested relief. State v. Nash, 212 N.J. 518, 541 (2013); Preciose, 129 N.J. at 459. To sustain that burden, the defendant must allege and articulate specific facts that "provide the court with an adequate basis on which to rest its decision." State v. Pennington, 418 N.J. Super. 548, 553 (App. Div. 2011) (quoting State v. Mitchell, 126 N.J. 565, 579 (1992)).

As noted, to establish a prima facie claim of ineffective assistance of counsel, the defendant is obligated to show not only the particular manner in which counsel's performance was deficient, but also that the deficiency prejudiced their right to a fair trial. Strickland, 466 U.S. at 687; Fritz, 105 N.J. at 58. Under the first prong of this test, the defendant must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687.

Under the second prong, the defendant must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Ibid. That is, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "[C]ounsel cannot be deemed ineffective for failing to raise arguments that are ultimately deemed without merit." State v. Roper, 362 N.J. Super. 248, 252 (App. Div. 2003) (citing State v. Worlock, 117 N.J. 596, 625 (1990)).

There is a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690. As such, "[j]udicial scrutiny of counsel's performance must be highly deferential," and "every effort [must] be made to eliminate the distorting effects of hindsight." Id. at 689. Thus, a trial court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and "the defendant must overcome the presumption that, under the circumstances, the challenged action

[by counsel] 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

With respect to defendant's arguments in points I-III, we reject all of them and affirm for the reasons expressed in Judge Isenhour's comprehensive and well-reasoned written opinion. We add the following comments to amplify our decision with respect to defendant's contentions in Point I.D. and address separately defendant's arguments raised in Point IV. We also briefly address, and reject, defendant's claim his counsel committed cumulative errors rendering his representation ineffective and his request for an evidentiary hearing.

A.    Conflict of Interest

As to defendant's claim his counsel failed to adequately investigate Davila or consider calling him as a witness due to counsel's alleged conflict of interest, we agree with Judge Isenhour defendant failed to establish either of Strickland's performance or prejudice prongs on that issue. Under both the State and Federal Constitutions, a conflict of interest may render an attorney's performance presumptively ineffective. United States v. Cronic, 466 U.S. 648, 662 n.31 (1984); State v. Bellucci, 81 N.J. 531, 543-46 (1980). We have repeatedly invoked "the accepted principle that a criminal defendant has the right to counsel 'whose representation is unimpaired and whose loyalty is undivided.'" State v.

19

Alexander, 403 N.J. Super. 250, 255 (App. Div. 2008) (quoting State v. Murray, 162 N.J. 240, 249 (2000)).

We apply "a two-tiered approach in analyzing whether a conflict of interest has deprived a defendant of his state constitutional right to the effective assistance of counsel." State v. Cottle, 194 N.J. 449, 467 (2008) (citing State v. Norman, 151 N.J. 5, 24-25 (1997)). First, the court must determine whether the conflict is a "per se conflict"—one of the "certain attorney conflicts [that] render the representation per se ineffective." Id. at 467, 470. If so, "prejudice is presumed in the absence of a valid waiver, and the reversal of a conviction is mandated." Id. at 467. A per se conflict for constitutional purposes arises only when "a private attorney . . . is involved in simultaneous dual representations of codefendants" or when "an attorney . . . is contemporaneously under indictment in the same county as his client, and being prosecuted by the same prosecutor's office." Id. at 467 (quoting Norman, 151 N.J. at 24-25), 473.

Absent a per se conflict, "the potential or actual conflict of interest must be evaluated and, if significant, a great likelihood of prejudice must be shown in that particular case to establish constitutionally defective representation of counsel." Id. at 467-68 (quoting Norman, 151 N.J. at 25). This approach

"provide[s] for broader protection against conflicts under the State Constitution than are provided by the Federal Constitution." Norman, 151 N.J. at 25.

Rule of Professional Conduct 1.7(a) provides "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest," which exists when "(1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation . . . will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer." In other words, "there must be 'a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests.'" In re Op. No. 17-2012 of Advisory Comm. on Prof'l. Ethics, 220 N.J. 468, 478 (2014) (quoting Model Rules of Prof'l. Conduct R. 1.7 cmt. 8 (2013)).

The Court explained "'[t]he critical questions are the likelihood that a difference in interests' will arise, and 'if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client.'" Id. at 478-79 (quoting Model Rules of Prof'l. Conduct R. 1.7 cmt. 8).

With regard to former clients, Rule of Professional Conduct 1.9(a) further states "[a] lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client," absent written consent.  However, "the nature of the prior representation must be examined" as "[p]rior representation, in and of itself, is not sufficient to justify disqualification."  State v. Hudson, 443 N.J. Super. 276, 291 (App. Div. 2015).  Two matters are "substantially related" if "(1) the lawyer for whom disqualification is sought received confidential information from the former client that can be used against that client in the subsequent representation of parties adverse to the former client, or (2) facts relevant to the prior representation are both relevant and material to the subsequent representation." Dental Health Assocs. S. Jersey, P.A. v. RRI Gibbsboro, LLC, 471 N.J. Super. 184, 194 (App. Div. 2022) (quoting City of Atlantic City v. Trupos, 201 N.J. 447, 467 (2010)).

Here, contrary to defendant's assertion, there was no per se conflict resulting in the presumption of prejudice, as nothing in the record indicates counsel was involved in "simultaneous dual representations of codefendants" or "contemporaneously under indictment in the same county as h[er] client, and

being prosecuted by the same prosecutor's office." Cottle, 194 N.J. at 467 (quoting Norman, 151 N.J. at 25). Accordingly, we must evaluate "the potential or actual conflict of interest," which must be "significant" and result in "a great likelihood of prejudice" for defendant to prevail. Id. at 467-68 (quoting Norman, 151 N.J. at 25).

Defendant points to nothing in the record demonstrating counsel represented Davila and defendant concurrently, and we thus assume Davila was a former client. As noted, "[p]rior representation, in and of itself, is not sufficient to justify disqualification." Hudson, 443 N.J. Super. at 291. The record is also devoid of any evidence demonstrating counsel's representation was "materially limited by [her] responsibilities to . . . a former client," Davila. RPC 1.7(a)(2).

Even assuming defendant's and Davila's interests were materially adverse, nothing in the record indicates the matter in which counsel represented Davila was "substantially related" to this case. RPC 1.9(a). There is no indication "facts relevant to the prior representation [of Davila] [we]re both relevant and material to the subsequent representation" of defendant. Dental Health Assocs., 471 N.J. Super. at 194 (quoting Trupos, 201 N.J. at 467). Additionally, as the court noted, it is not clear whether counsel, a member of the Public Defender's

23

Office, was assigned to Davila's case or was just standing in for a colleague. Counsel appeared on Davila's behalf only twice, with one appearance being postponed and the other indicating only that discovery was exchanged.

Defendant's only support for his claim of material limitation is counsel's failure to investigate or consider calling Davila as a witness. As the court noted, the record permits an inference that decision was an objectively reasonable trial strategy. Calling Davila would likely undermine any theory that he was the shooter, as his statement to police was consistent with Alzate's testimony that he left the area prior to the shooting. Further, Antonio testified Davila was wearing a black hoodie, permitting counsel to argue Davila's attire was consistent with witness descriptions of the shooter without calling Davila to testify.

Defendant has not shown any conflict based on counsel's former representation of Davila was significant or presented a "great likelihood of prejudice." Cottle, 194 N.J. at 468. For the reasons just described, defendant also falls short of establishing counsel's decision not to call Davila was "of such magnitude as to thwart the fundamental guarantee of [a] fair trial." State v. Castagna, 187 N.J. 293, 314-15 (2006) (alteration in original) (quoting State v. Buonadonna, 122 N.J. 22, 42 (1991)).

Additionally, the record is devoid of any facts defendant asserts could have been discovered through an investigation of Davila. See State v. Porter, 216 N.J. 343, 353 (2013) (requiring certification or affidavit describing facts that would have been discovered to succeed on failure to investigate claim). His bald assertions that counsel should have investigated Davila are insufficient to establish counsel's performance was deficient, or that defendant was prejudiced thereby.

B. Request for Supplemental Briefing Regarding DNA Evidence

We are not persuaded by defendant's argument in Point IV that further briefing regarding the DNA evidence and our decision in Rochat was necessary or that a remand is necessary for the court to address the issue. It is clear from Judge Isenhour's written decision he was painstakingly aware of the DNA evidence presented against defendant and its potential shortcomings. Indeed, the judge's written decision denying defendant's PCR petition described Ghannam's testimony at length.

In Rochat, we found the State "failed to 'clearly establish' general acceptance," as required under Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), of the low copy number (LCN) DNA testing technique and a proprietary statistical software program developed by the Office of the Chief Medical

Examiner of the City of New York known as Forensic Statistical Tool (FST). 470 N.J. Super. at 400, 450.  In contrast, here the DNA analysis on the gun did not use either the LCN technique or FST, but rather, as Ghannam testified, the short tandem repeat (STR) testing technique and the 2p statistical tool.  As the experts in Rochat explained, the LCN technique at issue in that case "is a modification of the conventional STR DNA technique" used here.   Id. at 411.  Further, Rochat did not announce a new rule of law, but rather applied the familiar Frye standard used to consider defendant's challenges to the DNA evidence before the trial court and on direct appeal.  Id. at 439.

Additionally, "[a] prior adjudication upon the merits of any ground for relief is conclusive," including in the original proceedings or on direct appeal. R. 3:22-5; see also Preciose, 129 N.J. at 476 (holding "a prior adjudication on the merits ordinarily constitutes a procedural bar to the reassertion of the same ground as a basis for post-conviction review").   In other words, a defendant cannot assert as grounds for a PCR petition an issue which has previously been adjudicated on the merits.  Here, the reliability of Ghannam's DNA analysis was addressed by the court and on direct appeal, both of which conducted a Frye analysis and determined the evidence was admissible.  James, No. A-3880-16 (slip op. at 7-8, 11-12).

As we found in our previous opinion, Ghannam's testimony regarding the DNA evidence on the gun, "admittedly limited by the expert herself, was harmless beyond a reasonable doubt" in light of the "overwhelming" evidence against defendant. Id. at 13-14. Specifically, that evidence included the testimony of a disinterested citizen eyewitness describing the shooting; defendant's flight from the scene during which he discarded the murder weapon, his "outer garment" which was consistent with witness descriptions of the shooter's attire, and wallet; defendant's admission to the murder to a jailhouse informant; and defendant's call to his sister the day after the murder asking her to move the family car, which was parked on the street where the shooting occurred. Id. at 13.

C. Cumulative Error and Request for Evidentiary Hearing

Finally, we also reject defendant's argument his counsel's alleged cumulative errors deprived him of effective legal representation and the judge erred in denying him an evidentiary hearing. Having found no support for defendant's claim his counsel was ineffective; we consequentially find no cumulative error and because he failed to establish a prima facie ineffective assistance of counsel claim under Strickland, there was no need for an evidentiary hearing. See Preciose, 129 N.J. at 462 ("[T]rial courts ordinarily

should grant evidentiary hearings to resolve ineffective assistance of counsel claims if a defendant has presented a prima facie claim in support of [PCR].").

To the extent we have not expressly addressed any argument defendant raised, it is because we have determined it is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2232-21